**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA and STATE OF FLORIDA *ex rel.* ROBERT PARKER,**

**Plaintiffs/Relator,**

**v.**

**Case No.: 6:13-CV-1068-ORL-22TBS**

**SPACE COAST MEDICAL ASSOCIATES, L.L.P., DR. CYNTHIA JEAN BRYANT, and BREVARD HEMATOLOGY AND ONCOLOGY CONSULTANTS – LEVINE, ZIMM AND SPRAWLS, M.D., P.A. *aka* SPACE COAST CANCER CENTER,**

**Defendants.**
______________________________________/

**DEFENDANTS' CONSOLIDATED**
**MOTION TO DISMISS RELATOR'S COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

Brian Newman (FBN: 004758)
William D. Horgan (FBN: 176877)
PENNINGTON, P.A.
215 S. Monroe Street, 2nd Floor (32301)
P.O. Box 10095 (32302-2095)
Tallahassee, FL
Telephone: (850) 222-3533
Fax: (850) 222-2126
bnewman@penningtonlaw.com
whorgan@penningtonlaw.com

-and-

Mark D. Colley (*pro hac vice*)
Alan E. Reider (*pro hac vice*)
Murad Hussain (*pro hac vice*)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Fax: (202) 942-5999
Mark.Colley@aporter.com
Alan.Reider@aporter.com
Murad.Hussain@aporter.com

***Counsel for Defendants Space Coast Medical Associates, L.L.P., Dr. Cynthia Jean Bryant, and Brevard Hematology and Oncology Consultants – Levine, Zimm, and Sprawls, M.D., P.A. aka Space Coast Cancer Center***

Defendants Space Coast Medical Associates, L.L.P. ("SCMA"), Dr. Cynthia Jean Bryant, and Brevard Hematology and Oncology Consultants – Levine, Zimm, and Sprawls, M.D., P.A. *aka* Space Coast Cancer Center ("Brevard") (collectively, "Defendants") hereby respectfully move this Court to dismiss Relator's Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), for failure to plead plausible and particular claims upon which relief may be granted, as set forth in the incorporated Memorandum of Law below.

**MEMORANDUM OF LAW**

## I. INTRODUCTION

Defendants operate a multi-facility cancer treatment practice. (Compl. ¶ 4.) The Complaint alleges that Defendants defrauded three government healthcare programs – Medicare Part B, Medicaid, and TRICARE – by submitting false claims for radiation therapy treatments that they performed.[1] The Complaint's allegations lack the necessary plausibility and particularity to withstand immediate dismissal.[2]

Counts I through VI rest on three alleged billing "schemes" (*see* Compl. at 1 (preamble)) that supposedly violated the federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A),

---

[1] Reimbursement under Medicaid and TRICARE is modeled after Medicare. (*See, e.g.*, Compl. ¶ 40.)

[2] These are not all of the problems with Relator's allegations. If this case proceeds, then Defendants would show that in April 2013, three months before filing this action, Relator completed an employee survey as part of Space Coast's annual regulatory compliance process. Relator's signed survey response represented that he (1) had never observed any conduct by any employee that was improper, illegal, or in violation of the Practice's policies; (2) was not aware of any coding or billing activities that were improper, illegal, or violated any state or federal regulations; and (3) was not aware of any patient care matters that warranted his employer's attention. These signed representations squarely contradict Relator's allegations that Defendants are "responsible for the creation of a serious danger to public health." (Compl. ¶ 1.)

(a)(1)(B), and (a)(1)(G), and the parallel provisions of the Florida False Claims Act.[3] Relator contends that Defendants falsely certified compliance with Medicare requirements (i) to document physician approval of various radiation therapy planning activities and (ii) for physician supervision. Relator's Complaint, however, does not show why any alleged claim for payment should be considered false because it violated a Medicare requirement. The Complaint rests on alleged Medicare requirements that are either misstated or invented. As detailed below, controlling regulations do not require the planning activities or supervision levels that Relator claims are necessary.

In addition, Rule 9(b) requires that Relator plead the particulars of the alleged fraud, including specific submissions to the government. Yet, the Complaint presents only conclusory allegations that Defendants caused false claims by engaging in allegedly improper practices. In complete disregard of Eleventh Circuit precedent, the Complaint does not identify any false claim for payment, false certification, false statement, or government-insured patient whose treatment was billed improperly. This alone is fatal to Relator's case.

## II. THE PARTIES

Defendant Brevard is a partner in defendant SCMA (hereinafter together referred to as "Space Coast" or "the Practice"), which is a Florida medical practice specializing in hematology and oncology. (*See* Compl. ¶¶ 2, 4.) Defendant Bryant is a radiation oncologist employed by the Practice. (*See id.* ¶ 3.)

---

[3] Relator's claims under the federal and Florida FCAs in Counts I through VI rise or fall together, "[b]ecause the Florida False Claims Act mirrors the federal False Claims Act and is subject to the same pleading standard . . . ." *U.S. ex rel. Schubert v. All Children's Health Sys., Inc.*, No. 8:11-CV-1687, 2013 WL 1651811, at *5 (M.D. Fla. Apr. 16, 2013).

Relator alleges that he was hired as a radiation therapist in Space Coast's Viera office on June 13, 2011, and was employed there when he filed this action. (Compl. ¶ 5.)

## III. LEGAL STANDARDS

The FCA prohibits the submission of knowingly false or fraudulent claims to be paid by the federal government. *See generally* 31 U.S.C. § 3729(a). It "does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *U.S. ex rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002). "Underlying improper practices alone are insufficient to state a claim under the False Claims Act absent allegations that a specific fraudulent claim was in fact submitted to the government." *U.S. ex rel. Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).

In order to survive a Rule 12(b)(6) motion, a complaint must contain factual allegations sufficient to raise a right to relief above the speculative level. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although a complaint must only set forth a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8)(a)(2), that liberal pleading standard "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009) (interpreting Rule 8(a)(2)). A complaint may not merely recite the elements of a cause of action. Rather,

> [a] plaintiff must state sufficient facts, assumed true, to state a claim to relief that is plausible on its face, *i.e.*, a claim that creates a reasonable inference of the defendant's liability and fairly notifies the defendant of both the claim and the grounds upon which it rests. A complaint alleging facts merely consistent with a defendant's liability stops short of the line between possibility and plausibility of entitlement to relief and a formulaic recitation of the elements of a cause of action will not do.

*Duldulao v. La Creperia Café, Inc.*, No. 8:11-CV-1413, 2011 WL 6840585, at *2 (M.D. Fla. Dec. 29, 2011) (citations and quotation marks omitted). Under *Iqbal*'s two-pronged approach,

courts "first separat[e] out the complaint's conclusory legal allegations and then determin[e] whether the remaining well-pleaded factual allegations, accepted as true, 'plausibly give rise to an entitlement to relief.'" *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 679). "[A] mere legal conclusion (*e.g.*, 'the defendant was negligent') lacks factual content and, therefore, can offer no factual content in support of the complaint." *Hitchcock v. Scipione*, No. 8:13-CV-2581, 2013 WL 6184037, at *1 (M.D. Fla. Nov. 25, 2013).

An FCA complaint must also comply with Rule 9(b)'s heightened pleading standard, which requires a party to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Thus, *qui tam* complaints alleging billing fraud must contain not only detailed allegations about all "allegedly fraudulent acts, when they occurred, and who engaged in them," but also include specific allegations about the existence and timing of "actual improper claims" submitted to the government. *Clausen*, 290 F.3d at 1310-12 (citation omitted). By requiring plaintiffs to "plead all the elements of [a] claim with specificity," Rule 9(b) "protect[s] defendants from frivolous suits, or spurious charges of immoral and fraudulent behavior," so that plaintiffs cannot "learn the complaint's bare essentials through discovery and . . . needlessly harm . . . defendants' goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements." *Id.* at 1313 n.24 (citations and quotation marks omitted). Accordingly, enforcing Rule 9(b) results in "claims with discernible boundaries and manageable discovery limits." *U.S. ex rel. Feingold v. Palmetto Gov't Benefits Adm'rs*, 477 F. Supp. 2d 1187, 1196 (S.D. Fla. 2007) (citation omitted).

Under the FCA, these pleading standards require that the complaint set forth plausibly and with particularity the "who," "what," "where," "when," and "how" of a "fraudulent submission[] to the government." *Corsello*, 428 F.3d at 1014 (affirming dismissal of *qui tam* for



67897149v23

lack of particularity); *cf. Freeman v. Sharpe Resources Corp.*, No. 6:12-CV-1584, 2013 WL 2151723, at *9 (M.D. Fla. May 16, 2013) (Conway, C.J.) (adopting report and recommendation) (Rule 9(b) requires a complaint to allege "(1) the precise statements, documents or misrepresentations made; (2) the time, place and person responsible for the statements; (3) the content and manner in which the statements misled plaintiff; and (4) what the defendants gained from the alleged fraud"). The Complaint here must thus be assessed to determine whether it shows that the Practice's alleged conduct was improper at all, based on (i) whether it alleges plausibly or particularly a violation of any condition for Medicare payment and (ii) whether it identifies any specific instance where the Practice falsely certified compliance with any payment conditions. Absent such allegations, Relator has not pled that any claims were ever "false."

## IV. ARGUMENT

### A. Counts I and II Fail to Allege Plausibly That Any Claims Presented To The Government Were Actually False.

Counts I and II assert that Defendants presented false claims for government payment. (*See* Compl. ¶¶ 131-140, 141-149.) FCA liability for a false claim requires "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, No. 2:11–CV–089, 2013 WL 1149255, at *6 (M.D. Fla. Mar. 19, 2013) (dismissing claims under § 3729(a)(1)(A) and (B) with prejudice) (citation omitted). Even accepting Relator's factual allegations as true, the Complaint does not demonstrate why any of the alleged claims for Medicare payment were false or fraudulent.

A claim may be "factually" false if it "misrepresents what goods or services [were] provided to the government," or it may be "legally" false "when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition

for Government payment." *U.S. ex rel. Prime v. Post, Buckley, Schuh & Jernigan, Inc.*, No. 6:10-CV-1950, 2013 WL 4506357, at *8 (M.D. Fla. Aug. 23, 2013) (citation omitted). As this Court has recently explained:

> Where a contractor participates in a certain government program in order to perform the services for which payments are eventually made – in this case, Medicare – courts are careful to distinguish between conditions of program participation and conditions of payment. Conditions of participation, as well as a provider's certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program. Conditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment.

*U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, No. 6:09-CV-10002, 2014 WL 2968251, at *5 (M.D. Fla. July 1, 2014).

The Complaint does not allege that Defendants submitted factually false claims, *i.e.*, that the Practice billed the government for services that were not provided. Therefore, the Complaint must instead allege, with particularity, that Defendants submitted legally false claims, by falsely certifying compliance with a condition of federal payment. "Proceeding under the false certification theory, however, does not alleviate Relator's obligation to plead [his] case with particularity." *Schubert*, 2013 WL 1651811, at *3. To plead a false claim via false certification here, the Complaint must plausibly and particularly allege (1) violations of conditions of federal payment for radiation therapy, and (2) *specific* false certifications of compliance with such conditions. The Complaint does neither.

Relator alleges that Defendants undertook three schemes that supposedly violated Medicare's documentation and supervision requirements for radiation therapy by treating patients (1) before a radiation oncologist "verified" the treatment plan (Compl. ¶ 72); (2) before a medical physicist performed quality assurance evaluations on the patient (*id.* ¶ 84); and (3)

without a radiation oncologist present at the treatment facility (*id.* ¶ 94). None of this violates a condition of Medicare (or other government) payment.

### 1. The Medicare coverage framework

At issue here is the Medicare Part B program. (*See* Compl. ¶ 20.) "Medicare Part B is a public health insurance program that provides the disabled and elderly with outpatient items and services . . . ." *Hays v. Sebelius*, 589 F.3d 1279, 1280 (D.C. Cir. 2009). Payment for services under the program is guided by statutory, regulatory, and administrative authority. Medicare Part B is administered by the Secretary of Health and Human Services, through the Centers for Medicare and Medicaid Services ("CMS"), which delegates many administrative functions – including reviewing and processing claims for payment – to regional contractors known variously as "Medicare Administrative Contractors" ("MACs"), "contractors," or "carriers." *See Hays*, 589 F.3d at 1280; 42 U.S.C. § 1395kk-1(a)(4). (*See also* Compl. ¶ 22.) The government can determine whether a service is covered under Medicare Part B by issuing a "national coverage determination" ("NCD"), which is a binding decision about "whether or not a particular item or service is covered nationally." 42 U.S.C. § 1395y(l)(6)(A). Absent an authoritative NCD, a MAC may develop a "local coverage determination" ("LCD") to explain whether or not a particular service is covered within the MAC's geographic area. *See id.* § 1395kk-1(a)(4); *id.* § 1395y(l)(5) & (6)(B); *Hays*, 589 F.3d at 1280. In other words, LCDs "clarify the conditions of coverage and reimbursement for particular services." (Compl. ¶ 22.)

There are no NCDs addressing treatment coverage for any of the four forms of radiation therapy at issue here: Intensity Modulated Radiation Therapy ("IMRT"), Stereotactic Body Radiation Therapy ("SBRT"), Stereotactic Radiosurgery ("SRS"), and Three-Dimensional Conformal Radiation Therapy ("3D-CRT"). (*See* Compl. ¶¶ 54, 103 (alleging that these procedures comprise 100 percent of the Practice's radiation therapy treatments).) First Coast

Service Options, Inc. ("FCSO"), the MAC for Florida, has published two applicable LCDs cited in the Complaint and discussed below: LCD L29200, regarding IMRT (attached hereto as Exhibit A), and LCD L30366, regarding SRS and SBRT (attached hereto as Exhibit B).[4] FCSO has not issued an LCD for 3D-CRT treatment.

**2. The allegations of untimely documentation**

The Complaint alleges that "Dr. Bryant routinely fails to verify radiation treatment plans *prior to* Defendants' *delivery* of radiation treatment on cancer patients." (Compl. ¶ 72 (emphases added).) The related allegations focus on Dr. Bryant's supposed failure to provide her formal approval of a patient's IMRT treatment plan before the patient undergoes the procedure. (*See id.* ¶¶ 73-78.) But, formally verifying and documenting treatment plan approval before treatment begins is not a condition of Medicare payment.

LCD L29200 requires certain "documentation" in order to support billing the charge for having developed the IMRT treatment plan, such as a radiation oncologist's signed and dated review of that treatment plan. (*See* Compl. ¶ 75; *see also* Ex. A at 2-3.) The LCD does not, however, require that the physician formally verify the plan's approval in the billing documentation *before* commencing *treatment*.

Further, Relator has confused Dr. Bryant's responsibility to develop and approve the plan before *treatment* with her responsibility to document her approval before *billing* for that

---

[4] These LCDs are attached for the Court's convenience, as they are judicially noticeable and available on the official CMS website at http://www.cms.gov/medicare-coverage-database. Additionally, the Complaint's extensive quotation from these LCDs incorporates them by reference. *See Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1266 n.11 (11th Cir. 2006) ("[A] document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, we may consider such a document if that document is central to the plaintiff's claims." (citation and quotation marks omitted)).

treatment. Relator alleges that Dr. Bryant fails to "verify" radiation treatment plans, a term which his allegations equate to plan "approval." (Compl. ¶¶ 72-73.) Relator acknowledges, however, that the radiation treatment is itself dependent on having a plan developed by the radiation oncologist (*id.* ¶¶ 76-77), and distinguishes the "approval" and verification step from the plan's development. (*Id.* ¶¶ 79, 81-82.) Relator does not allege that any patient's treatment was not the product of a plan developed by Dr. Bryant, or that treatment was ever administered without a properly developed plan (*i.e.*, a therapist like Relator did not on his own simply administer radiation treatments without such a patient plan). Relator alleges *only* that an approval or verification of the *billing* documentation may have post-dated the commencement of *treatment*. Relator cites no requirement that such plan verification or approval must be documented before treatment begins. This alone ends the inquiry.

Even if there were some expectation that billing documentation is verified before treatment commences, the Complaint does not allege why Medicare would withhold payment for an otherwise valid treatment simply because such a ministerial documentary requirement was not satisfied. *Cf. Baklid-Kunz*, 2014 WL 2968251, at *5 (rejecting argument that hospital's patient admission claims were rendered false by absence of physician admission orders, where relator "offer[ed] no argument as to why Medicare would refuse to pay an otherwise valid claim if it knew that the patient's medical record did not contain an admission order (or, along the same lines, an argument that the government would be damaged by paying an otherwise valid claim in the absence of such an order)"). The Complaint thus does not establish that this step is a condition of payment. Moreover, the Complaint does not actually allege any specific occasions when the Practice submitted treatment bills before Dr. Bryant documented her approval of the

treatment plans.[5] The Complaint, therefore, fails to plead this alleged scheme adequately as a basis for FCA liability. (*See* Compl. ¶¶ 132(d)-(f), 142(d)-(f).)

The Complaint also alleges that the Practice delivered "serious radiation treatment" before its medical physicist, Dr. Andrew Winningham, performed quality assurance ("QA") evaluations on patients. (Compl. ¶ 84.) This allegation, however, is based solely on Dr. Winningham's alleged failure to perform a formal QA evaluation of a *single* patient's SBRT procedure before the patient received treatment. (*See id.* ¶¶ 85-90.) As an initial matter, Relator's account of a single patient experience is a facially insufficient factual foundation for the purported fraudulent billing scheme alleged.[6] Moreover, the Complaint once again does not allege that performing formal pre-treatment QA evaluations is required by any statute, regulation, or other controlling authority.[7] Nor is there any allegation that pre-treatment QA evaluations are a condition of Medicare payment for an otherwise valid claim. Instead, Relator attempts to extrapolate a requirement for a pre-treatment QA evaluation from a provision relating

[5] Relator makes the broad allegation that claim forms submitted to the Government for radiation treatment plans prior to Dr. Bryant's approval "are fraudulent because such plans were not developed or supervised by Dr. Bryant." (Compl. ¶ 79.) Relator does not, however, allege that any claims for plan development (under CPT Code 77301) were ever submitted prior to Dr. Bryant's documented approval, and cites no such instance. To the contrary, he specifically references Dr. Bryant's approval of the plans. (*Id.* ¶¶ 78, 80.) His allegations relate to the timing of plan approval/verification in the billing documentation relative to treatment commencement, rather than any specific allegation that Dr. Bryant submitted claims for treatment plans that she did not develop.

[6] Relator claims to have had access to information about and knowledge of when the alleged failures to complete a pre-treatment QA occurred during his employment, which preceded commencement of this action, but cites no other instance. (Compl. ¶¶ 92-93.)

[7] Relator alleges that QA is a prerequisite to conducting SBRT. (Compl. ¶ 90.) The Complaint's only cited reference to "quality assurance," however, concerns the LCD for the different IMRT procedure; further, that LCD calls only for documentation confirming that a "quality assurance (QA) program to monitor the IMRT planning and delivery systems" has been established, not for a per-patient pre-treatment QA. (*Id.* ¶ 91.)



67897149v23

to the *billing documentation* required by the LCD for these procedures. That LCD requires a signed evaluation of "the technical aspects of the treatment," but does not mention anything about a per-patient, pre-treatment "quality assurance evaluation." (*Compare* Ex. B (LCD L30366), *with* Compl. ¶¶ 84, 87, 89, 90.) And once again, Relator has conflated LCD requirements for billing documentation with pre-treatment obligations. LCD L30366 does not require formal documentation of QA evaluations "prior to *performing*" the procedures, as the Complaint alleges (Compl. ¶ 89 (emphasis added)), and whatever must be documented is only required "prior to *submitting* claim forms" (*id.* ¶ 88 (emphasis added)). Relator's own confusion about the necessary timing of required documentation undercuts his claims. Furthermore, the Complaint does not allege any specific occasions when the Practice *submitted bills* for SBRT or SRS before Dr. Winningham performed and documented any evaluations required by the applicable LCD. As a result, Relator has also failed to plausibly or particularly plead this alleged scheme as a basis for FCA liability. (Compl. ¶¶ 131(g)-(i), 142(g)-(i).)

**3. The allegations of insufficient supervision**

The Complaint alleges that the Practice delivered radiation therapy when a radiation oncologist (*i.e.*, Dr. Bryant) was not present at the treatment facility. (Compl. ¶ 94.) Relator repeatedly offers legal conclusions about the type of supervision that Medicare requires for radiation therapy, such as: "Many radiation therapy procedures require [Dr. Bryant's] direct supervision" (*id.* ¶ 46), meaning that she must be physically present at the treatment facility and able to furnish assistance during the procedure (*id.* ¶ 101 (quoting 42 C.F.R. § 410.32(b)(3)(ii))). Legal conclusions are not well-pleaded allegations that must be assumed true. *See Iqbal*, 556 U.S. at 678. And for good reason: Relator's legal conclusion is wrong.

The applicable LCDs do not require that a radiation oncologist be present during radiation therapy. In fact, LCDs L29200 and L30366 say *nothing* about physician supervision

requirements for the radiation treatments at issue.[8] (*See generally* Exs. A & B.) This silence is noteworthy because FCSO knows how to specify supervision requirements when it wants to: the final section of LCD L29200 requires a radiation oncologist's direct supervision of a fifth type of procedure, not at issue here, called Image Guided Radiation Therapy ("IGRT").[9] (*See* Ex. A at 5.) FCSO's decision not to establish similar supervision requirements for the other forms of radiation therapy in its LCDs means that direct supervision by a radiation oncologist is not a condition of Medicare payment. *Cf. Whitfield v. United States*, 543 U.S. 209, 216-217 (2005) (where Congress demonstrated that it knows how to impose a requirement elsewhere, the requirement will not be read in where it was omitted). As a result, the Complaint's allegations that Dr. Bryant did not directly supervise certain treatments are of no consequence.

The Complaint also cites the Medicare Benefit Policy Manual ("MBPM") for the proposition that radiation therapy provided in a physician's office "require[s] direct personal supervision of *a physician*," meaning the physician "must be in the area and immediately available to provide assistance and direction throughout the time the procedure is being performed." (Compl. ¶ 99 (emphasis added; quotation marks omitted).)[10] Notably, the MBPM

---

[8] Relator wrongly asserts that LCD L30366 requires the presence of a radiation oncologist "throughout the provision of SBRT and SRS." (Compl. ¶ 109.) The quoted passage of the LCD merely notes the requirements that a radiation oncologist (or a neurosurgeon) evaluate and document their evaluation of the clinical and technical aspects of treatment. (*See id.*; *see also* Ex. B at 8.) Nothing in LCD L30366 discusses supervision.

[9] The Complaint does not allege that Defendants billed any government program for IGRT procedures where a radiation oncologist was not present. Although Relator asserts that "SBRT and SRS require the use of IGRT" (Compl. ¶ 113), LCD L30366 makes no mention of IGRT or any supervision requirements. Nor does the Complaint allege that Defendants billed for inadequately supervised IGRT in connection with any SBRT or SRS treatment.

[10] "Direct supervision" requires a physician's presence on-site, but not in the room where a procedure is performed. (Compl. ¶ 101.)

merely requires supervision by "a physician," and does not require that the "physician" be a radiation oncologist. The Complaint does not allege that there was *no* physician on site while radiation treatments were provided. To the contrary, Relator acknowledges that other physicians – such as medical oncologists (*i.e.*, physicians specializing in non-radiation cancer treatments) – *were* present in the facility. (*Id.* ¶ 104.)[11]

Relator does not cite any authority that disqualifies other physicians – medical oncologists – from providing the requisite supervision for the radiation treatments (*i.e.*, being available at the facility). Instead, he insists that these medical oncologists are not "clinically appropriate" to supervise the procedures because they lacked knowledge to "'change a procedure or the course of treatment being provided to a particular patient.'" (*See* Compl. ¶¶ 104-107 (quoting HHS, *Medicare Program: Changes to the Hospital Outpatient Prospective Payment System and CY 2010 Payment Rates; Changes to the Ambulatory Surgical Center Payment System and CY 2010 Payment Rates; Final Rule*, 74 Fed. Reg. 60316, 60584 (Nov. 20, 2009)).) Relator's bald allegation that physicians other than radiation oncologists – such as medical oncologists – cannot provide appropriate supervision of the radiation treatments is entirely unsupported. It is also flatly inconsistent with Medicare's position, which recognizes that these treatments may be supervised by *non-physician practitioners.*[12] Relator's attempt to extrapolate

[11] Medicare contemplates that the treatment supervision may be provided by a physician other than the treating radiation oncologist: "CMS would not expect that the supervisory physician or nonphysician practitioner would make all decisions unilaterally without informing or consulting the patient's treating physician or nonphysician practitioner." CMS Medicare Benefit Policy Manual, Ch. 6 § 20.5.2 at 19-20, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c06.pdf.

[12] When amending supervisory regulations related to outpatient hospital therapeutic services, CMS responded to a specific inquiry about radiation oncology and observed that, with suitable practice scope and privileges, a nonphysician practitioner could provide that supervision. *See* 75 Fed. Reg. 71800, 72012 (Nov. 24, 2010).

a more stringent requirement simply makes no sense and is not supported by any governmental authority. Medicare would not permit non-physician practitioners to supervise treatment in a hospital, but mandate that on-site supervision by even a *physician* is insufficient in other clinical settings unless that physician is a radiation oncologist. Relator's argument thus rests on an effort to invent, via illogical interpretation, a supervision requirement that does not in fact exist.[13] Because Relator has not alleged that supervision by a radiation oncologist is a Medicare condition of payment for the radiation treatments at issue, he has not provided a basis for FCA liability with regard to claims for radiation oncology services that were allegedly not supervised by a radiation oncologist. (*See* Compl. ¶¶ 132(a)-(b), 142(a)-(b).)

### B. Relator's Allegations Do Not Show That Any Claims For Payment Were "Knowingly" False.

False Claims Act liability depends on the submission of claims that are known to be false. Claims and statements are "knowingly" false when a person has "actual knowledge of the information," or "acts in deliberate ignorance" or "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1).

Relator has not cited any regulatory provisions that contain clear documentation and supervision requirements on which his action depends, such that any claim not in compliance would be objectively false. Instead, he interprets and extrapolates the alleged requirements, which means that he must demonstrate, based on *indirect* evidence, that the regulatory provisions

[13] Relator also alleges that physician supervision at the Defendants' facilities is not truly supervision because the physicians are "not routinely informed which patients are receiving radiation treatment delivery at any given time." (Compl. ¶ 107.) Aside from offering no support for his allegation, Relator cites no requirement for such communication with the supervising physician. Instead, direct supervision requires only that the physician be available at the facility. (*Id.* ¶ 101.)

were so clear that acting to the contrary was at least reckless disregard. *See U.S. ex rel. Streck v. Allergan, Inc,* 894 F. Supp. 2d 584, 592 (E.D. Pa. 2012).

Although not a False Claims Act case, the U.S. Supreme Court resolved in *Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007), that "reckless disregard" is an objective standard. Courts have subsequently applied *Safeco* when interpreting the FCA's knowledge requirement. *See, e.g.*, *Streck*, 894 F. Supp. 2d at 592 (applying *Safeco*); *U.S. ex rel. K & R L.P. v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008) (same). Consequently, the alleged violation of a statutory or regulatory requirement must be more than merely "careless," so that an objectively reasonable, plausible interpretation of ambiguous language precludes a finding of actual knowledge, deliberate ignorance, or reckless disregard. Thus, under *Safeco*, "for Relator's . . . Complaint to survive, the Court must conclude that it plausibly shows that Defendants' interpretation of" the relevant administrative requirements "'ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'" *Streck*, 894 F. Supp. 2d at 593, 600 (partially dismissing *qui tam* under Rule 12(b)(6)) (quoting *Safeco*, 551 U.S. at 70); *see also U.S. ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1190 (8th Cir. 2010) (affirming dismissal of *qui tam* under Rule 12(b)(6) and explaining that "a statement that a defendant makes based on a reasonable interpretation of a statute cannot support a claim under the FCA if there is no authoritative contrary interpretation of that statute").

Relator does not cite any Medicare requirement for pre-treatment therapy plan approvals or QA, so even if those steps were not accomplished as alleged, Relator has not shown any basis for Defendants to have known that such actions would render their claims for Medicare payment false. Likewise, with regard to the purported supervision requirements, Medicare's only articulation of supervision requirements mandates supervision by a radiation oncologist for only

one type of radiation therapy, which is not at issue here, and otherwise expressly identifies both physicians (whether or not radiation oncologists) and non-physician practitioners as suitable to fulfill the supervisory function. Relator's claims rest on his own views of what constitutes someone "clinically appropriate" to provide the requisite supervision.

Relator identifies no communication from CMS or FCSO -- the entities that establish the conditions for Medicare payment -- providing any reason for Defendants to have understood that they could not submit claims to reimburse radiation treatments unless supervised by a radiation oncologist. Consequently, Relator has not presented allegations which, if true, allow this Court to conclude that the claims for treatment without a radiation oncologist providing direct supervision were *knowingly* false. *See, e.g.*, *Streck*, 894 F. Supp. 2d at 600 (dismissing FCA claim where "there was no regulatory, statutory, or judicial guidance" to warn defendants "away from the view they took" and *qui tam* did not allege facts "for the Court to plausibly infer that [the defendants' practices] were not a reasonable interpretation" of regulatory requirements (quotation marks omitted)). The Complaint must therefore be dismissed for failure to state a claim under the False Claims Act.

### C. Counts I and II Fail to Allege With Sufficient Particularity That False Claims Were Presented To The Government.

Counts I and II also fail because they do not (1) identify any specific false claims submitted for government payment; (2) plausibly establish that false claims were actually presented to the government; or (3) identify any specific false certifications.

#### 1. Relator fails to allege specific false claims.

"The submission of a false claim is the *sine qua non* of a False Claims Act violation." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (citation, quotation marks, brackets, and ellipsis omitted). "Without the presentment of a false claim, 'there is simply no

actionable damage to the public fisc as required under the False Claims Act' even if the entity's practices are unwise or improper." *Mastej*, 2013 WL 1149255, at *7 (quoting *Clausen*, 290 F.3d at 1311).

"In order to plead the submission of a false claim with particularity, a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012). "But nowhere in the blur of facts" assembled by Relator "can one find any allegation, stated with particularity, of a false claim actually being submitted to the Government." *Clausen*, 290 F.3d at 1312. Without specific allegations about "actual false claims," Relator here cannot "lay a complete foundation for the rest of his allegations." *Id.* at 1314 n.25. The Complaint thus fails under Rule 9(b) and, for this reason alone, must be dismissed. *See, e.g.*, *U.S. ex rel. Westlund v. Lab. Corp. of Am. Holdings*, No. 8:10-CV-2882, 2011 WL 6846748, at *1 (M.D. Fla. Dec. 29, 2011) (dismissing *qui tam* complaint that "never identifie[d] a false claim submitted to the government – an element of specificity under Rule 9(b) that [*Clausen*] requires").

**2. Relator fails to allege plausibly that any false claims were actually presented to government programs.**

FCA liability "requires that false claims actually be submitted to the federal government." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 869 F. Supp. 2d 1336, 1342 (M.D. Fla. 2012). The Complaint lacks any well-pleaded allegations of any such submissions. Relator offers only the naked conclusion that "claims" (with no allegation about their veracity or falsity) "were *likely* submitted and should have been submitted to the Government Healthcare Programs for the above-described radiation therapy procedures . . . ." (Compl. ¶ 130 (emphasis added).) This is not the same as alleging that *false* claims were actually submitted to government

programs. *Cf. Clausen*, 290 F.3d at 1311 (rejecting unsupported assertion "that claims requesting *illegal* payments must have been submitted, were likely submitted or should have been submitted to the Government" (emphasis added)).

At most, Relator alleges that from March 2013 to June 2013, the Practice administered radiation therapy to 11 patients while supposedly violating documentation and supervision requirements; that at some unspecified later time, the services rendered to these patients "were billed" to Medicare; and that these bills were tainted as "false" because of the violations. (*See* Compl. ¶¶ 110-111, 118, 122-123.)

Only three of these eleven patients are characterized as "Medicare patient[s]." (*See* Compl. ¶¶ 85 (patient N), 111 (patient P), 118 (patient R).)[14] Merely because someone is a Medicare patient, however, does not necessarily mean that Medicare was billed for his or her treatment. *See, e.g., U.S. ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 460 (4th Cir. 2013) (dismissing *qui tam* action for failing to plead false claims and rejecting relator's assertion that "if a patient is insured under a government program, [courts] reasonably may infer . . . that a claim was presented to the government" for their treatment), *cert. denied,* 134 S. Ct. 1759 (2014). Patients can pay out of pocket or use private insurance for their coverage. *See, e.g., United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 874-876 (11th Cir. 2003). In fact, Relator does not allege that any bill was ever submitted for any services rendered to those patients.

Even when taken in the light most favorable to Relator, his conclusory allegations merely make it possible, rather than plausible, that false claims for services provided to these patients were submitted to government payors. His allegations are equally consistent with the possibility

[14] Eight of the 11 patients are not alleged to be beneficiaries of any government healthcare plan, so they are irrelevant for purposes of Relator's legal claims. (*See* Compl. ¶¶ 110 (patient O), 111 (patient Q), 122 (patients S, T, U, and V), 123 (patients W and X).)

that these patients' treatments were billed to *private* payors, whether insurance companies or the patients themselves, or were not billed at all.[15] *See, e.g.*, *Nathan*, 707 F.3d at 460 (declining to infer that government was billed for certain prescriptions, because allegations were also consistent with the notion that "the patients paid for it themselves or . . . the patients' private insurers paid for it" (citation omitted)). Such ambiguous pleading does not satisfy Rule 8(a), which "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

Because the allegations about these patients "*could* have led, but *need not necessarily* have led, to the submission of false claims," Relator must still "allege with particularity that specific false claims actually were presented to the government for payment." *Nathan*, 707 F.3d at 457. His failure to do so requires dismissal of the Complaint. *See, e.g.*, *Mastej*, 2013 WL 1149255, at *10 (dismissing *qui tam* complaint that failed to identify specifically any patients for whom a false claim was submitted to government); *see also U.S. ex rel. McMullen v. Ascension Health*, No. 3:12-CV-501, 2013 WL 6073549, at *3 (M.D. Tenn. Nov. 18, 2013) (dismissing *qui tam* for failing to specify, *inter alia*, "which of those Medicare patients whose claims were false had claims actually submitted to the government for payment").

This case is distinguishable from those where a relator, despite failing to identify specific false claims, asserted personal knowledge that the defendant actually submitted false claims. Here, Relator misleadingly claims to have "firsthand knowledge of Defendants' medical coding *and billing practices* with respect to radiation therapy procedures." (Compl. ¶ 124 (emphasis added).) But, he actually does not allege any personal experience with their *billing* practices.

[15] Relator concedes that in many instances services were identified with a "000000" procedure code, but that a different code ("77421") was required for billing. (*See* Compl. ¶¶ 115-119.)

Instead, allegedly, he "and other radiation therapists" merely inputted billing *codes* for procedures into Defendants' computer system, without evidently having anything more to do with preparing or submitting any bills. (*Id.* ¶ 126.) Relator alleges that a different Practice employee, Sondra Beausang, "bill[ed] the patients' government and private insurance providers."[16] (*Id.* ¶ 127.) Thus, by his own admission, Relator has no personal knowledge of Defendants' billings; it is Ms. Beausang, a non-party, who allegedly does – and even then, she is not alleged to have any knowledge that *false* claims were billed *to the government*. *Cf. Atkins*, 470 F.3d at 1359 (declining to relax Rule 9(b)'s requirement that particular claims be pled because relator did "not profess to have firsthand knowledge of the defendants' submission of false claims," as he was "a [practitioner] responsible for the provision of medical care, not a billing and coding administrator responsible for filing and submitting the defendants' claims for reimbursement").

**3. The Complaint does not identify specific false certifications.**

Just as the Complaint fails to identify specific false claims, it also fails to identify any specific false certifications of regulatory compliance with the supposed conditions of payment. Relator discusses various categories of false certifications that were supposedly made. (*See* Compl. ¶¶ 151, 160.) But, he never pleads a specific false certification, and thus never identifies, *inter alia*, "exactly which documents," "exactly which sentence and its substance," "who was responsible," "when the [c]ertification was submitted," "and what the Defendants gained as a result." *Matheny*, 671 F.3d at 1225 (*qui tam* satisfied Rule 9(b) where it alleged those details). This does not pass muster under Rule 9(b). *See, e.g.*, *Schubert*, 2013 WL 1651811, at *4

[16] Again, Relator's allegations make it equally plausible that this billing was to non-government payors, rather than to government payors.

(dismissing complaint for failing, *inter alia*, to allege false certifications with particularity and contrasting the deficient allegations with *Matheny* allegations' level of detail).

**4. Relator's additional allegations fail for lack of support.**

Relator demands recovery for three additional categories of false claims where the Complaint does not provide any support for his allegations. First, the Complaint demands recovery for any claims where services provided were not medically necessary. (Compl. ¶¶ 131(k)-(l), 142(k)-(l).) The Complaint references Medicare requirements that services be medically necessary (*id.* ¶¶ 27, 29, 33, 57 68), but does not identify any services that were not medically necessary. Second, Relator seeks recovery for false claims to reimburse for IGRT radiation treatments (*id.* ¶¶ 121, 132(c), 132(j), 142(c), 142(j)), but rather than allege any claims for such treatments the Complaint instead alleges that no such claims were submitted because all treatments were for other services. (*Id.* ¶¶ 54, 103.) Third, Relator alleges that billing documentation was falsified by listing Dr. Bryant "as both the primary oncologist and covering oncologist" regardless of whether she was "actually in the facility in which the radiation treatment delivery procedures occur" (*id.* ¶ 108), but does not identify any specific "documentation" at issue, and infers without any explanation or authority that being listed as a "primary" and "covering" physician is synonymous with a representation of "direct supervision." Relator cites no requirement to identify the supervising physician in any claim submission to Medicare. The Complaint's demands alluding to claims for medically unnecessary treatments, IGRT services, or false designation of a supervising physician must thus be dismissed under Rules 8(a) and 9(b).

### D. Counts III and IV Fail to Allege Plausibly or Particularly the Submission of False Statements Material to False Claims.

Counts III and IV assert that Defendants made false statements material to the government's payment of false claims. (*See* Compl. ¶¶ 150-158, 159-167.) To state a claim under § 3729(a)(1)(B), the FCA's "false statement" provision, a complaint must plead adequately that "(1) the defendant made a false record or statement [material to] a false claim paid or approved by the government; and (2) the defendant's false record or statements caused the government to actually pay a false claim, either to the defendant itself, or to a third party." *Mastej*, 2013 WL 1149255, at *11 (citation omitted). To support these Counts, the Complaint references categories of allegedly false certifications and other statements. (*See* Compl. ¶¶ 151(a)-(j), 160(a)-(j).) The "documentation" allegedly falsified is not specified, nor is the materiality of that documentation to any claim payment decision described or explained. Moreover, FCA liability for false statements rests on those statements being made in support of a false claim, and as discussed, Relator has not pled adequately that false claims were submitted to the government. Similarly, he has failed to identify any specific instances of other allegedly false statements. Relator does not identify any false statements made to Medicare in order to satisfy any condition of payment. Counts III and IV must therefore be dismissed.

### E. Counts V and VI Fail to Allege Plausibly or Particularly the Existence of "Reverse" False Claims.

Counts V and VI assert, in conclusory fashion, that Defendants engaged in "reverse false claims" by supposedly making false statements to conceal a failure to refund payments improperly received from government healthcare programs. (*See* Compl. ¶¶ 168-177, 178-187.) To state a claim under § 3729(a)(1)(G), the FCA's "reverse false claims" provision, a complaint must plead adequately "(1) a false record or statement and (2) the defendant's knowledge of the falsity; (3) that the defendant makes, uses, or causes to be made or used a false statement; (4) for

the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) materiality of the misrepresentation." *Mastej*, 869 F. Supp. 2d at 1346 (citation omitted).

Relator's failure to plead adequately any actual false claims undercuts his assertion that the Practice had any obligation to refund the payments it received. Additionally, the allegations of Counts V and VI impermissibly parrot the elements of the statutory causes of action, "simply mak[ing] legal conclusions that [D]efendants" violated the law, without offering any "specific allegations" to support the claim. *Mastej*, 869 F. Supp. 2d at 1346 (dismissing claim regarding reverse false claims). Yet, these are the *only* allegations in the entire Complaint that mention reverse false claims.

The Complaint offers no specific factual support about the alleged withholding of overpayments. For example, "[t]he Complaint fails to allege any amounts owed to the government by the defendants." *Mastej*, 869 F. Supp. 2d at 1346. Nor does it identify any "specific false statement or record that was made to knowingly conceal or decrease an obligation to pay or transmit money to the Government," or offer any non-conclusory "factual assertions" to that effect. *U.S. ex rel. Heesch v. Diagnostic Physicians Grp., P.C.*, No. 1:11-CV-364, 2014 WL 2154241, at *10 (S.D. Ala. May 22, 2014) (dismissing government's reverse false claims count under Rule 9(b)).

Moreover, "[t]o sustain a reverse false claim action, relators must show that the defendants owed an obligation to pay money to the United States *at the time of the allegedly false statements.*" *Matheny*, 671 F.3d at 1223 (emphasis added). The Complaint does not plausibly allege the existence of any certifications about concurrently existing obligations to repay funds *already received* from the government. Rather, Relator only references categories of certifications made to obtain government money *in the future* – *i.e.*, certifications concerning

bills being submitted or to be submitted in the future. (*See*, *e.g.*, Compl. ¶¶ 151(a)-(j), 160(a)-(j).) Because such certifications would only concern money not yet received, they were not made "at the time" that Defendants supposedly "owed an obligation to pay money" back to the government *Matheny*, 671 F.3d at 1223. All of these deficiencies under Rules 8(a) and 9(b) further compel dismissal of Counts V and VI.

## V. CONCLUSION

For the foregoing reasons, Relator's Complaint should be dismissed for failure to plead plausible and particular claims upon which relief may be granted

Dated: September 2, 2014

Respectfully submitted,

/s/ William D. Horgan
Brian Newman (FBN: 004758)
William D. Horgan (FBN: 176877)
PENNINGTON, P.A.
215 S. Monroe Street, 2nd Floor (32301)
P.O. Box 10095 (32302-2095)
Tallahassee, FL
Telephone: (850) 222-3533
Fax: (850) 222-2126
bnewman@penningtonlaw.com
whorgan@penningtonlaw.com

/s/ Mark D. Colley
Mark D. Colley (*pro hac vice*)
Alan E. Reider (*pro hac vice*)
Murad Hussain (*pro hac vice*)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Fax: (202) 942-5999
Mark.Colley@aporter.com
Alan.Reider@aporter.com
Murad.Hussain@aporter.com

*Counsel for Defendants Space Coast Medical Associates, L.L.P., Dr. Cynthia Jean Bryant, and Brevard Hematology and Oncology Consultants – Levine, Zimm, and Sprawls, M.D., P.A. aka Space Coast Cancer Center*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2014, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system.

/s/ William D. Horgan

Brian Newman (FBN: 004758)
William D. Horgan (FBN: 176877)
PENNINGTON, P.A.
215 S. Monroe Street, 2nd Floor (32301)
P.O. Box 10095 (32302-2095)
Tallahassee, FL
Telephone: (850) 222-3533
Fax: (850) 222-2126
bnewman@penningtonlaw.com
whorgan@penningtonlaw.com
*Counsel for Defendants*