**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA and STATE OF FLORIDA *ex rel.* ROBERT PARKER,**

**Plaintiffs/Relator,**

**Case No.: 6:13-CV-1068-ORL-22TBS**

**v.**

**SPACE COAST MEDICAL ASSOCIATES, L.L.P., DR. CYNTHIA JEAN BRYANT, and BREVARD HEMATOLOGY AND ONCOLOGY CONSULTANTS – LEVINE, ZIMM AND SPRAWLS, M.D., P.A. *aka* SPACE COAST CANCER CENTER,**

**Defendants.**
_______________________________________/

**DEFENDANTS' CONSOLIDATED**
**MOTION TO DISMISS RELATOR'S AMENDED COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

Brian Newman (FBN: 004758)
William D. Horgan (FBN: 176877)
PENNINGTON, P.A.
215 S. Monroe Street, 2nd Floor (32301)
P.O. Box 10095 (32302-2095)
Tallahassee, FL
Telephone: (850) 222-3533
Fax: (850) 222-2126
bnewman@penningtonlaw.com
whorgan@penningtonlaw.com

-and-

Mark D. Colley (*pro hac vice*)
Alan E. Reider (*pro hac vice*)
Murad Hussain (*pro hac vice*)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Fax: (202) 942-5999
Mark.Colley@aporter.com
Alan.Reider@aporter.com
Murad.Hussain@aporter.com

***Counsel for Defendants Space Coast Medical Associates, L.L.P., Dr. Cynthia Jean Bryant, and Brevard Hematology and Oncology Consultants – Levine, Zimm, and Sprawls, M.D., P.A. aka Space Coast Cancer Center***

Defendants Space Coast Medical Associates, L.L.P. ("SCMA"), Dr. Cynthia Jean Bryant, and Brevard Hematology and Oncology Consultants – Levine, Zimm, and Sprawls, M.D., P.A. *aka* Space Coast Cancer Center ("Brevard") (collectively, "Defendants" or the "Practice") move to dismiss Relator's Amended Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), for failure to plead plausible and particular claims upon which relief may be granted.[1]

**<u>MEMORANDUM OF LAW</u>**

## I. INTRODUCTION

Although Plaintiff had ample opportunity to review Defendants' prior Motion to Dismiss (Doc. 43), his Amended Complaint does not attempt to cure the original Complaint's deficiencies. The Amended Complaint alleges that Defendants defrauded three government healthcare programs – Medicare Part B, Medicaid, and TRICARE – by submitting false claims for radiation therapy treatments.[2] Like its predecessor, the Amended Complaint lacks the necessary plausibility and particularity to withstand immediate dismissal.[3]

---

[1] Relator's Amended Complaint added two Counts solely against Dr. Bryant (*see generally* Am. Compl.Doc. 51 ¶¶ 152-170 (Counts III and IV)), but continues to assert separate, overlapping counts against all "Defendants" generally, which necessarily includes Dr. Bryant. Because the legal arguments relating to Defendants also relate to Dr. Bryant, this Motion will refer to "Defendants" as a whole.

[2] Reimbursement under Medicaid and TRICARE is modeled after Medicare. (*See, e.g.*, Am. Compl. ¶ 40.)

[3] These are not all of the problems with Relator's allegations. If this case proceeds, then Defendants would show that in April 2013, three months before filing this action, Relator completed an employee survey as part of Space Coast's annual regulatory compliance process in which he represented that he (1) had never observed any conduct by any employee that was improper, illegal, or in violation of the Practice's policies; (2) was not aware of any coding or billing activities that were improper, illegal, or violated any state or federal regulations; and (3) was not aware of any patient care matters that warranted his employer's attention. These signed representations squarely contradict Relator's allegations that Defendants are "responsible for the creation of a serious danger to public health." (Am. Compl. ¶ 1.)

Counts I through VIII rest on three alleged billing "schemes" (*see* Am. Compl. at 1 (preamble)) that supposedly violated the federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G), and the parallel provisions of the Florida False Claims Act.[4] Relator contends that Defendants falsely certified compliance with Medicare requirements (i) to document physician approval of various radiation therapy planning activities and (ii) for physician supervision. Relator's Amended Complaint however, does not explain how any alleged claim for payment violated a Medicare requirement. Further, the Amended Complaint either misstates or invents purported Medicare requirements As detailed below, controlling regulations do not require the planning activities or supervision levels that Relator claims are necessary.

In addition, while Rule 9(b) requires Relator to plead the alleged fraud with particularity (including specific submissions to the government), the Amended Complaint contains only conclusory allegations that Defendants caused false claims by engaging in allegedly improper practices. Disregarding Eleventh Circuit precedent, the Amended Complaint does not identify any false claim for payment, false certification, false statement, or government-insured patient whose treatment was billed improperly. This alone is fatal to Relator's case.

## II. THE PARTIES

Defendants operate a multi-facility cancer treatment practice. (Am. Compl. ¶ 4.) Brevard is a partner in SCMA (hereinafter together referred to as "Space Coast" or "the

[4] Relator's claims under the federal and Florida FCAs in Counts I through VI rise or fall together, "[b]ecause the Florida False Claims Act mirrors the federal False Claims Act and is subject to the same pleading standard . . . ." *U.S. ex rel. Schubert v. All Children's Health Sys., Inc.*, No. 8:11-CV-1687, 2013 WL 1651811, at *5 (M.D. Fla. Apr. 16, 2013).

Practice”). (*See id.* ¶¶ 2, 4.) Bryant, a radiation oncologist, is employed by the Practice. (*See id.* ¶ 3.)

Relator alleges that he was hired as a radiation therapist in Space Coast’s Viera office on June 13, 2011, and was employed there when he filed this action. (Am. Compl. ¶ 6.)

## III. LEGAL STANDARDS

The FCA prohibits the submission of knowingly false or fraudulent claims to be paid by the federal government. *See generally* 31 U.S.C. § 3729(a). It “does not create liability merely for a health care provider’s disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe.” *U.S. ex rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002). “Underlying improper practices alone are insufficient to state a claim under the False Claims Act absent allegations that a specific fraudulent claim was in fact submitted to the government.” *U.S. ex rel. Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).

To survive a Rule 12(b)(6) motion, a complaint’s factual allegations must rise above speculation. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The liberal Rule 8(a)(2) pleading standard “does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.” *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009) (interpreting Rule 8(a)(2)). Rather,

> [a] plaintiff must state sufficient facts, assumed true, to state a claim to relief that is plausible on its face, *i.e.*, a claim that creates a reasonable inference of the defendant’s liability and fairly notifies the defendant of both the claim and the grounds upon which it rests. A complaint alleging facts merely consistent with a defendant’s liability stops short of the line between possibility and plausibility of entitlement to relief and a formulaic recitation of the elements of a cause of action will not do.

*Duldulao v. La Creperia Café, Inc.*, No. 8:11-CV-1413, 2011 WL 6840585, at *2 (M.D. Fla. Dec. 29, 2011) (citations and quotation marks omitted). Under *Iqbal*’s two-pronged approach,

courts "first separat[e] out the complaint's conclusory legal allegations and then determin[e] whether the remaining well-pleaded factual allegations, accepted as true, 'plausibly give rise to an entitlement to relief.'" *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 679). "[A] mere legal conclusion (*e.g.*, 'the defendant was negligent') lacks factual content and, therefore, can offer no factual content in support of the complaint." *Hitchcock v. Scipione*, No. 8:13-CV-2581, 2013 WL 6184037, at *1 (M.D. Fla. Nov. 25, 2013).

An FCA *qui tam* complaint must also comply with Rule 9(b)'s heightened pleading standard, and thus must contain both detailed allegations about all "allegedly fraudulent acts, when they occurred, and who engaged in them," and specific allegations about the existence and timing of "actual improper claims" submitted to the government. *Clausen*, 290 F.3d at 1310-12 (citation omitted). By requiring plaintiffs to "plead all the elements of [a] claim with specificity," Rule 9(b) "protect[s] defendants from frivolous suits, or spurious charges of immoral and fraudulent behavior," so that plaintiffs cannot "learn the complaint's bare essentials through discovery and . . . needlessly harm . . . defendants' goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements." *Id.* at 1313 n.24 (citations and quotation marks omitted). Enforcing Rule 9(b) results in "claims with discernible boundaries and manageable discovery limits." *U.S. ex rel. Feingold v. Palmetto Gov't Benefits Adm'rs*, 477 F. Supp. 2d 1187, 1196 (S.D. Fla. 2007) (citation omitted).

These pleading standards require FCA complaints to set forth plausibly and with particularity the "who," "what," "where," "when," and "how" of a "fraudulent submission[] to the government." *Corsello*, 428 F.3d at 1014 (affirming dismissal of *qui tam* for lack of particularity); *cf. Freeman v. Sharpe Resources Corp.*, No. 6:12-CV-1584, 2013 WL 2151723, at

*9 (M.D. Fla. May 16, 2013) (Conway, C.J.) (adopting report and recommendation) (Rule 9(b) requires a complaint to allege "(1) the precise statements, documents or misrepresentations made; (2) the time, place and person responsible for the statements; (3) the content and manner in which the statements misled plaintiff; and (4) what the defendants gained from the alleged fraud"). The Amended Complaint here must thus be assessed to determine whether it shows that the Practice's alleged conduct was improper at all, based on (i) whether it alleges plausibly or particularly a violation of any condition for Medicare payment and (ii) whether it identifies any specific instance where the Practice falsely certified compliance with any payment conditions. Absent such allegations, Relator did not plead any "false" claims.

## IV. ARGUMENT

### A. Counts I through IV Do Not Plausibly Allege That Any Claim Presented To The Government Was Actually False.

Counts I through IV rest on allegedly false claims for government payment. (*See* Am. Compl. ¶¶ 133-170.) FCA liability requires "(1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, No. 2:11–CV–089, 2013 WL 1149255, at *6 (M.D. Fla. Mar. 19, 2013) (dismissing claims under § 3729(a)(1)(A) and (B) with prejudice) (citation omitted). Even accepting Relator's factual allegations as true, the Amended Complaint does not demonstrate how any alleged claim for Medicare payment was false or fraudulent.

A claim may be "factually" false if it "misrepresents what goods or services [were] provided to the government," or it may be "legally" false "when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition

for Government payment." *U.S. ex rel. Prime v. Post, Buckley, Schuh & Jernigan, Inc.*, No. 6:10-CV-1950, 2013 WL 4506357, at *8 (M.D. Fla. Aug. 23, 2013) (citation omitted).

> Where a contractor participates in a certain government program in order to perform the services for which payments are eventually made – in this case, Medicare – courts are careful to distinguish between conditions of program participation and conditions of payment. Conditions of participation, as well as a provider's certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program. Conditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment.

*U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, No. 6:09-CV-10002, 2014 WL 2968251, at *5 (M.D. Fla. July 1, 2014).

The Amended Complaint does not allege that Defendants submitted factually false claims, *i.e.*, that the Practice billed the government for services that were not provided. Therefore, the Amended Complaint must instead allege, with particularity, that Defendants submitted legally false claims, by falsely certifying compliance with a condition of federal payment. "Proceeding under the false certification theory, however, does not alleviate Relator's obligation to plead [his] case with particularity." *Schubert*, 2013 WL 1651811, at *3. To plead a false claim via false certification here, the Amended Complaint must plausibly and particularly allege (1) violations of conditions of federal payment for radiation therapy, and (2) *specific* false certifications of compliance with such conditions. The Amended Complaint does neither.

Relator alleges that Defendants undertook three schemes that supposedly violated Medicare's documentation and supervision requirements for radiation therapy by treating patients (1) before a radiation oncologist "verified" the treatment plan (Amended Complaint ¶ 73); (2) before a medical physicist performed quality assurance evaluations on the patient (*id.* ¶ 85); and (3) without a radiation oncologist present at the treatment facility (*id.* ¶ 95). None of this violates a condition of payment established by Medicare (or any other government payor).

### 1. The Medicare coverage framework

At issue here is the Medicare Part B program. (*See* Am. Compl. ¶ 21.) "Medicare Part B is a public health insurance program that provides the disabled and elderly with outpatient items and services . . . ." *Hays v. Sebelius*, 589 F.3d 1279, 1280 (D.C. Cir. 2009). Payment under the program is governed by statutory, regulatory, and administrative authority. The Secretary of Health and Human Services administers Medicare Part B through the Centers for Medicare and Medicaid Services ("CMS"), which delegates many administrative functions – including reviewing and processing claims – to regional "Medicare Administrative Contractors" ("MACs"). *See Hays*, 589 F.3d at 1280; 42 U.S.C. § 1395kk-1(a)(4). (*See also* Am. Compl. ¶ 23.) The government can determine whether a service is covered under Medicare Part B by issuing a "national coverage determination" ("NCD"), which establishes "whether or not a particular item or service is covered nationally." 42 U.S.C. § 1395y(l)(6)(A). Absent an applicable NCD, a MAC may develop a "local coverage determination" ("LCD") to explain whether a particular service is covered within that MAC's geographic area. *See id.* § 1395kk-1(a)(4); *id.* § 1395y(l)(5) & (6)(B); *Hays*, 589 F.3d at 1280. LCDs "clarify the conditions of coverage and reimbursement for particular services." (Am. Compl. ¶ 23.)

There are no NCDs addressing coverage for any of the radiation therapies at issue here: Intensity Modulated Radiation Therapy ("IMRT"), Stereotactic Body Radiation Therapy ("SBRT"), Stereotactic Radiosurgery ("SRS"), and Three-Dimensional Conformal Radiation Therapy ("3D-CRT"). (*See* Am. Compl. ¶¶ 55, 104 (alleging that these procedures comprise 100 percent of the Practice's radiation treatments).) First Coast Service Options, Inc. ("FCSO"), the MAC for Florida, has published two applicable LCDs cited in the Amended Complaint and

discussed below: LCD L29200, regarding IMRT (attached hereto as Exhibit A), and LCD L30366, regarding SRS and SBRT (attached hereto as Exhibit B).[5]

**2. The allegations of untimely documentation**

The Amended Complaint alleges that "Dr. Bryant routinely fails *to verify* radiation treatment plans *prior to* Defendants' *delivery of radiation treatment* on cancer patients." (Am. Compl. ¶ 73 (emphases added).) The related allegations focus on Dr. Bryant's supposed failure to formally approve IMRT treatment plans before patients undergo the procedure. (*See id.* ¶¶ 74-79.) Contrary to Relator's allegation, however, formally verifying and documenting treatment plan approval before treatment begins is not a condition of Medicare payment.

LCD L29200 requires certain "documentation" to support billing for the development of IMRT treatment plans, such as a radiation oncologist's signed and dated review of the treatment plan. (*See* Am. Compl. ¶ 76; *see also* Ex. A at 2-3.) The LCD does not, however, require a physician to formally verify the plan's approval in the billing documentation *before* commencing *treatment*.

Further, Relator has confused Dr. Bryant's responsibility to develop and approve the plan before *treatment*, with her responsibility to document her approval before *billing* for that treatment. Relator alleges that Dr. Bryant fails to "verify" radiation treatment plans, a term which his allegations equate to "approval" of those plans. (Am. Compl. ¶¶ 73-74.) Relator

---

[5] These LCDs are attached for the Court's convenience, as they are judicially noticeable and available on the official CMS website at http://www.cms.gov/medicare-coverage-database. Additionally, the Amended Complaint's extensive quotation of these LCDs incorporates them by reference. *See Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1266 n.11 (11th Cir. 2006) ("[A] document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, we may consider such a document if that document is central to the plaintiff's claims." (citation and quotation marks omitted)). There is no FCSO LCD for 3D-CRT.

acknowledges, however, that the radiation treatment is itself dependent on having a plan developed by the radiation oncologist (*id.* ¶¶ 77-78), and distinguishes the "approval" and verification step from the plan's development. (*Id.* ¶¶ 80, 82-83.) Relator does not allege that any patient received treatment without a plan developed by Dr. Bryant, or that treatment was ever administered without a proper plan (*i.e.*, a therapist like Relator did not on his own simply administer radiation treatments without an appropriately prescribed plan). Rather, Relator alleges *only* that the treatment plan's approval may have been verified in the billing documentation at some point *after* treatment commenced. Relator cites no requirement that such approval must be documented before treatment begins. This alone ends the inquiry.

Even assuming some expectation that billing documentation will be verified before treatment commences, the Amended Complaint does not allege why Medicare would withhold payment for an otherwise valid treatment simply because this ministerial requirement was not satisfied. *Cf. Baklid-Kunz,* 2014 WL 2968251, at *5 (rejecting argument that hospital's patient admission claims were rendered false by absence of physician admission orders, where relator "offer[ed] no argument as to why Medicare would refuse to pay an otherwise valid claim if it knew that the patient's medical record did not contain an admission order (or, along the same lines, an argument that the government would be damaged by paying an otherwise valid claim in the absence of such an order)"). The Amended Complaint thus does not establish that this step is a condition of payment. It also does not allege any specific occasion when the Practice actually submitted bills for treatments rendered before Dr. Bryant documented treatment plan approval.[6]

---

[6] Relator makes the broad allegation that claim forms submitted to the Government for radiation treatment plans before Dr. Bryant's approval "are fraudulent because such plans were not developed or supervised by Dr. Bryant." (Am. Compl. ¶ 80.) Relator does not, however, allege that any claims for plan development (under CPT Code 77301) actually were submitted prior to Dr. Bryant's documented approval, and cites no such instance. To the contrary, he specifically

Footnote continued on next page

The Amended Complaint, therefore, fails to plead this alleged scheme adequately to preserve any related Count for FCA liability. (*See* Am. Compl. ¶¶ 134(d)-(f), 142(d)-(f), 153(d)-(f), 163(d)-(f).)

The Amended Complaint also alleges that the Practice delivered "serious radiation treatment" before its medical physicist, Dr. Andrew Winningham, performed quality assurance ("QA") evaluations on patients. (Am. Compl. ¶ 85.) This allegation, however, is based solely on Dr. Winningham's alleged failure to perform a formal QA evaluation of a *single* patient's SBRT procedure before the patient received treatment. (*See id.* ¶¶ 86-91.) As an initial matter, an account of a single patient experience is a facially insufficient factual foundation for the purported fraudulent billing *scheme* that Relator alleges.[7] Moreover, the Amended Complaint once again does not allege that performing formal pre-treatment QA evaluations is required by any statute, regulation, or other controlling authority.[8] Nor is there any allegation that pre-treatment QA evaluations are a condition of Medicare payment for an otherwise valid claim. Instead, Relator attempts to extrapolate a requirement for pre-treatment QA evaluations from a provision relating to the *billing documentation* required by the LCD for these procedures. That

---

Footnote continued from previous page
references Dr. Bryant's approval of the plans. (*Id.* ¶¶ 79, 81.) His allegations relate to the timing of plan approval/verification in the billing documentation relative to treatment commencement, rather than any specific allegation that Dr. Bryant submitted claims for treatment plans that she did not develop and approve.

[7] Relator claims to have knowledge of when the alleged failures to complete a pre-treatment QA occurred during his employment, but cites no other instance. (Am. Compl. ¶¶ 93-94.)

[8] Relator alleges that QA is a prerequisite to conducting SBRT. (Am. Compl. ¶ 91.) The Amended Complaint's only cited reference to "quality assurance," however, concerns the LCD for the different IMRT procedure. Further, that LCD calls only for documentation confirming that a "quality assurance (QA) program to monitor the IMRT planning and delivery systems" has been established, not for a per-patient pre-treatment QA. (*Id.* ¶ 92.)

LCD requires a signed evaluation of "the technical aspects of the treatment," but does not mention anything about a per-patient, pre-treatment "quality assurance evaluation." (*Compare* Ex. B (LCD L30366), *with* Am. Compl. ¶¶ 85, 88, 90, 91.)

And once again, Relator has conflated LCD requirements for *billing documentation* with *pre-treatment obligations*. LCD L30366 does not require formal documentation of QA evaluations "prior to *performing*" the procedures, as the Amended Complaint alleges (Am. Compl. ¶ 90 (emphasis added)); whatever must be documented is required only "prior to *submitting* claim forms" (*id.* ¶ 89 (emphasis added)). Furthermore, the Amended Complaint does not allege any specific occasion when the Practice *submitted bills* for SBRT or SRS before Dr. Winningham performed and documented any QA evaluations required by the applicable LCD. As a result, Relator has also failed to plausibly or particularly plead this alleged scheme sufficiently to preserve any related Count for FCA liability. (*Id.* ¶¶ 134(g)-(i), 142(g)-(i), 153(g)-(i), 163(g)(i).)

**3. The allegations of insufficient supervision**

The Amended Complaint alleges that the Practice delivered radiation therapy when a radiation oncologist (*i.e.*, Dr. Bryant) was not present at the treatment facility. (Am. Compl. ¶ 95.) Relator repeatedly offers only legal conclusions about the supervision that Medicare requires for radiation therapy, such as: "Many radiation therapy procedures require [Dr. Bryant's] direct supervision" (*id.* ¶ 47), meaning that she must be physically present at the facility and able to furnish assistance during the procedure (*id.* ¶ 102 (quoting 42 C.F.R. § 410.32(b)(3)(ii))). Legal conclusions are not allegations that must be assumed true. *See Iqbal*, 556 U.S. at 678. And for good reason: Relator's legal conclusion is wrong.

As a matter of law, the applicable LCDs do not require a radiation oncologist to be present during radiation therapy. In fact, LCDs L29200 and L30366 say *nothing* about physician

supervision requirements for the radiation treatments at issue.[9] (*See generally* Exs. A & B.) This silence is noteworthy because FCSO knows how to specify supervision requirements when it wants to: the final section of LCD L29200 requires a radiation oncologist's direct supervision of a fifth type of procedure, not at issue here, called Image Guided Radiation Therapy ("IGRT").[10] (*See* Ex. A at 5.) FCSO's decision not to establish similar supervision requirements for the other procedures in its LCDs means that direct supervision by a radiation oncologist is not a condition of Medicare payment. *Cf. Whitfield v. United States*, 543 U.S. 209, 216-217 (2005) (where Congress demonstrated that it knows how to impose a requirement elsewhere, the requirement will not be read in where it was omitted). As a result, the Amended Complaint's allegations that Dr. Bryant did not directly supervise certain treatments are of no consequence.

The Amended Complaint also cites the Medicare Benefit Policy Manual ("MBPM") for the proposition that radiation therapy provided in a physician's office "require[s] direct personal supervision of *a physician*," meaning the physician "must be in the area and immediately available to provide assistance and direction throughout the time the procedure is being

---

[9] Relator wrongly asserts that LCD L30366 requires the presence of a radiation oncologist "throughout the provision of SBRT and SRS." (Am. Compl. ¶ 110.) The quoted passage of the LCD merely notes the requirements that a radiation oncologist (or a neurosurgeon) evaluate and document his or her evaluation of the clinical and technical aspects of treatment. (*See id.*; *see also* Ex. B at 8.) Nothing in LCD L30366 discusses supervision.

[10] Although the Amended Complaint makes many allusions to IGRT, it does not allege that Defendants billed any government program for IGRT procedures where a radiation oncologist was not present. To the contrary, it alleges that Defendants were cautious to identify IGRT procedures with a non-billable code when a radiation oncologist was not on-site. (Am. Compl. ¶¶ 119-120.) Although Relator also asserts that "SBRT and SRS require the use of IGRT" (*id.* ¶ 114), the LCD applicable to those procedures (LCD L30366) makes no mention of IGRT or any supervision requirements. Nor does the Amended Complaint allege that Defendants billed for inadequately supervised IGRT in connection with any SBRT or SRS treatment.

performed." (Am. Compl. ¶ 100 (emphasis added; quotation marks omitted).)[11] This is incorrect. The MBPM only requires supervision by "a physician," but does not require that the "physician" be a radiation oncologist. The Amended Complaint does not allege that *no* physician was on site during radiation treatments. To the contrary, Relator acknowledges that other physicians – such as medical oncologists (*i.e.*, physicians specializing in non-radiation cancer treatments) – *were* present in the facility. (*Id.* ¶ 105.)[12]

Relator's reliance on 42 C.F.R. 410.26(b) is also misguided. (*See* Am. Compl. ¶101.) This provision applies only to services provided "incident to" the services of a physician or non-physician practitioner; Medicare's "incident to" rules are *not* applicable to services like radiation therapy because radiation therapy services are specifically listed in the Social Security Act as a separate benefit included in the Medicare program. *See* 42 C.F.R. 410.26(a)(7); *see also* Social Security Act 1861(s)(4) (establishing Medicare coverage for X-ray, radium, and radioactive isotope therapy, including materials and services of technicians).[13] Accordingly, the only supervision requirements applicable to radiation therapy are spelled out in the MBPM (Ch. 15,

---

[11] "Direct supervision" requires a physician's presence on-site, but does not require that the physician be in the room where a procedure is performed. (Am. Compl. ¶ 102.)

[12] Medicare contemplates that the treatment supervision may be provided by a physician other than the treating radiation oncologist: "CMS would not expect that the supervisory physician or nonphysician practitioner would make all decisions unilaterally without informing or consulting the patient's treating physician or nonphysician practitioner." CMS Medicare Benefit Policy Manual, Ch. 6 § 20.5.2 at 19-20, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c06.pdf.

[13] 42 C.F.R. 410.26(a)(7) and 42 C.F.R. 410.26(b) define "services and supplies" to mean "any services or supplies (including drugs or biologicals that are not usually self-administered) that are included in section 1861(s)(2)(A) of the Act ***and are not specifically listed in the Act as a separate benefit included in the Medicare program***." 42 C.F.R. 410.26(a)(7) (emphasis added.) Because radiation therapy has a separate benefit category, it is excluded from the "services and supplies" paid for "incident to" a physician's services.

§90), which as Relator acknowledges requires only that radiation therapy services be supervised by "a physician." (Am. Compl. ¶ 101.)

Relator does not cite any authority that disqualifies other physicians – such as medical oncologists – from providing the requisite supervision for the radiation treatments (*i.e.*, being available at the facility). Instead, he insists that medical oncologists are not "clinically appropriate" to supervise the procedures because they lack knowledge to "'change a procedure or the course of treatment being provided to a particular patient.'" (*See* Am. Compl. ¶¶ 105-108 (quoting HHS, *Medicare Program: Changes to the Hospital Outpatient Prospective Payment System and CY 2010 Payment Rates; Changes to the Ambulatory Surgical Center Payment System and CY 2010 Payment Rates; Final Rule*, 74 Fed. Reg. 60316, 60584 (Nov. 20, 2009)).) Relator's bald allegation that physicians other than radiation oncologists – such as medical oncologists – cannot provide appropriate supervision is entirely unsupported.

As an initial matter, Relator's cited regulatory authority comes from a passage discussing requirements specifically applicable to *hospitals*, not clinics such as Space Coast. (Am. Compl. ¶106 (citing "Medicare Program: Changes to the Hospital Outpatient Prospective Payment System…." 74 Fed. Reg. 60316).) Even if this hospital-related regulation did apply to Space Coast – which it does not – Relator has misinterpreted its meaning. Medicare recognizes that these treatments may be supervised by *non-physician practitioners.*[14] Relator's attempt to impose a more stringent requirement on the Practice is not supported by any governmental authority. Furthermore, it makes no sense. Medicare would not permit non-physician

---

[14] When amending supervisory regulations related to outpatient hospital therapeutic services, CMS responded to a specific inquiry about radiation oncology and observed that even a nonphysician practitioner could provide that supervision in certain circumstances. *See* 75 Fed. Reg. 71800, 72012 (Nov. 24, 2010).

practitioners to supervise these treatments in a hospital, but mandate that in other clinical settings, on-site supervision by even a *physician* is insufficient unless that physician is a radiation oncologist. Relator's argument rests on an effort to invent, via illogical interpretation, a supervision requirement that does not in fact exist.[15] Because Relator has not alleged that supervision by a radiation oncologist is a Medicare condition of payment for the procedures at issue, he has not presented a basis for the purported FCA liability asserted in Counts I-IV regarding claims for radiation oncology services allegedly not supervised by a radiation oncologist. (*See* Am. Compl. ¶¶ 134(a)-(c), 144(a)-(c), 153(a)-(c), 163(a)-(c).)

**B. Relator's Allegations Do Not Show That Any Claims For Payment Were "Knowingly" False.**

False Claims Act liability depends on the submission of claims that are known to be false. Claims and statements are "knowingly" false when a person has "actual knowledge of the information," or "acts in deliberate ignorance" or "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1).

Relator has not cited any regulatory provisions that contain clear documentation and supervision requirements on which his action depends, such that any non-compliant claim would be objectively false. Instead, he interprets and extrapolates alleged requirements, which means that he must demonstrate, based on *indirect* evidence, that the regulatory provisions were so clear that acting to the contrary was at least reckless disregard. *See U.S. ex rel. Streck v. Allergan, Inc*, 894 F. Supp. 2d 584, 592 (E.D. Pa. 2012).

---

[15] Relator also alleges that physician supervision at Defendants' facilities is not truly supervision because the physicians are "not routinely informed which patients are receiving radiation treatment delivery at any given time." (Am. Compl. ¶ 108.) Aside from offering no support for his allegation, Relator cites no requirement for such communication with the supervising physician. Direct supervision requires only that the physician be available at the facility. (*Id.* ¶ 102.)

Although not a False Claims Act case, in *Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007), the U.S. Supreme Court resolved that "reckless disregard" is an objective standard. Courts have subsequently applied *Safeco* when interpreting the FCA's knowledge requirement. *See, e.g.*, *Streck*, 894 F. Supp. 2d at 592 (applying *Safeco*); *U.S. ex rel. K & R L.P. v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008) (same). Consequently, the alleged violation of a statutory or regulatory requirement must be more than merely "careless," so that an objectively reasonable, plausible interpretation of ambiguous language precludes a finding of actual knowledge, deliberate ignorance, or reckless disregard. Under *Safeco*, "for Relator's . . . Complaint to survive, the Court must conclude that it plausibly shows that Defendants' interpretation of" the relevant administrative requirements "'ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'" *Streck*, 894 F. Supp. 2d at 593, 600 (partially dismissing *qui tam* under Rule 12(b)(6)) (quoting *Safeco*, 551 U.S. at 70); *see also U.S. ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1190 (8th Cir. 2010) (affirming dismissal of *qui tam* under Rule 12(b)(6) and explaining that "a statement that a defendant makes based on a reasonable interpretation of a statute cannot support a claim under the FCA if there is no authoritative contrary interpretation of that statute").

Medicare's only articulation of purported supervision requirements mandates radiation oncologist supervision for only one radiation therapy procedure, not at issue here, and expressly allows both physicians (whether or not radiation oncologists) *and* non-physician practitioners to fulfill the supervisory function. Relator's claims improperly rest on his personal views of what constitutes a physician who is "clinically appropriate" to provide the requisite supervision. Relator identifies no communication from CMS or FCSO -- the entities that establish conditions for Medicare payment -- providing any reason for Defendants to have

understood that they could not submit claims for radiation treatments unless supervised by a radiation oncologist.

Likewise, Relator does not cite any Medicare requirement for pre-treatment therapy plan approvals or QA. Even if those steps were not accomplished as alleged, Relator has not shown any basis for Defendants to have known that such actions would render false their claims for Medicare payment.

Consequently, the Amended Complaint must be dismissed because Relator has not presented allegations which, if true, allow this Court to conclude that the claims were *knowingly* false. *See, e.g.*, *Streck*, 894 F. Supp. 2d at 600 (dismissing FCA claim where "there was no regulatory, statutory, or judicial guidance" to warn defendants "away from the view they took" and the *qui tam* complaint did not allege facts "for the Court to plausibly infer that [the defendants' practices] were not a reasonable interpretation" of regulatory requirements (quotation marks omitted)).

### C. Counts I through IV Fail to Allege With Sufficient Particularity That False Claims Were Presented To The Government.

Counts I through IV also fail because they do not (1) identify any specific false claims submitted for government payment; (2) plausibly establish that false claims were actually presented to the government; or (3) identify any specific false certifications.

#### 1. Relator fails to allege specific false claims.

"The submission of a false claim is the *sine qua non* of a False Claims Act violation." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (citation, quotation marks, brackets, and ellipsis omitted). "Without the presentment of a false claim, 'there is simply no actionable damage to the public fisc as required under the False Claims Act' even if the entity's

practices are unwise or improper." *Mastej*, 2013 WL 1149255, at *7 (quoting *Clausen*, 290 F.3d at 1311).

"In order to plead the submission of a false claim with particularity, a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012). "But nowhere in the blur of facts" assembled by Relator "can one find any allegation, stated with particularity, of a false claim actually being submitted to the Government." *Clausen*, 290 F.3d at 1312. Absent specifically alleged "actual false claims," Relator cannot "lay a complete foundation for the rest of his allegations." *Id.* at 1314 n.25. The Amended Complaint thus fails under Rule 9(b) and, for this reason alone, must be dismissed. *See, e.g.*, *U.S. ex rel. Westlund v. Lab. Corp. of Am. Holdings*, No. 8:10-CV-2882, 2011 WL 6846748, at *1 (M.D. Fla. Dec. 29, 2011) (dismissing *qui tam* complaint that "never identifie[d] a false claim submitted to the government – an element of specificity under Rule 9(b) that [*Clausen*] requires").

**2. Relator fails to allege plausibly that any false claims were actually presented to government programs.**

FCA liability "requires that false claims actually be submitted to the federal government." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 869 F. Supp. 2d 1336, 1342 (M.D. Fla. 2012). The Amended Complaint lacks well-pleaded allegations of such submissions.

Relator's only attempt to identify specific false claims is a failure. He alleges that from March 2013 to June 2013, the Practice provided radiation therapy to 11 patients while supposedly violating documentation and supervision requirements; that at some unspecified later time, those services "were billed" to either Medicare or another payor; and that the bills were "false" because of the violations. (*See* Am. Compl. ¶¶ 111-112, 119, 123-124.) Only three of

the eleven patients are characterized as "Medicare patient[s]." (*Id.* ¶¶ 86 (patient N), 112 (patient P), 119 (patient R).)[16] Merely because someone is a Medicare patient, however, does not mean that Medicare was billed for the treatment. *See, e.g.*, *U.S. ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 460 (4th Cir. 2013) (dismissing *qui tam* action for failing to plead false claims and rejecting relator's assertion that "if a patient is insured under a government program, [courts] reasonably may infer . . . that a claim was presented to the government" for their treatment), *cert. denied*, 134 S. Ct. 1759 (2014). Patients can pay out of pocket or use private insurance. *See, e.g.*, *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 874-876 (11th Cir. 2003). Relator alleges having learned that a bill was submitted to Medicare for one patient, "Patient N," but does not specify what services were billed. (*See* Am. Compl. ¶ 132(c).)[17] Relator does not allege that any other bill was submitted to Medicare for these patients.

Relator's other conclusory allegations merely make it possible, rather than plausible, that false claims were submitted to government payors. His allegations are equally consistent with the possibility that treatments were billed to *private* payors, whether insurance companies or the patients themselves, or were not billed at all.[18] *See, e.g.*, *Nathan*, 707 F.3d at 460 (declining to

---

[16] Eight of the 11 patients are not alleged to be beneficiaries of any government healthcare plan, so they are irrelevant for purposes of Relator's legal claims. (*See* Am. Compl. ¶¶ 111 (patient O), 111 (patient Q), 123 (patients S, T, U, and V), 124 (patients W and X).)

[17] Relator alleges that Patient N supposedly received unsupervised radiation therapy before a medical physicist performed a QA evaluation (Am. Compl. ¶¶ 86, 111), but nothing in the Amended Complaint indicates that the bill allegedly submitted for this patient was for that particular treatment. And, even if a bill were submitted to Medicare for that particular treatment, it would not be rendered "false" by allegations that QA evaluations were not documented prior to *treatment* or that a radiation oncologist did not directly supervise the therapy. *See supra* §§ IV.A.2. and A.3.

[18] Relator concedes that in many instances services were identified with a "000000" procedure code, but that a different code ("77421") was required for billing. (*See* Am. Compl. ¶¶ 116-120.)

infer that government was billed for certain prescriptions, because allegations were also consistent with the notion that "the patients paid for it themselves or . . . the patients' private insurers paid for it" (citation omitted)); *Clausen*, 290 F.3d at 1311 (rejecting unsupported assertion "that claims requesting *illegal* payments must have been submitted, were likely submitted or should have been submitted to the Government" (emphasis added)). Such ambiguous pleading does not satisfy Rule 8(a), which "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Because the conduct Relator alleges "*could* have led, but *need not necessarily* have led, to the submission of false claims," Relator must still "allege with particularity that specific false claims actually were presented to the government for payment." *Nathan*, 707 F.3d at 457. *See, e.g.*, *Mastej*, 2013 WL 1149255, at *10 (dismissing *qui tam* complaint that failed to identify specifically any patients for whom a false claim was submitted to government); *see also U.S. ex rel. McMullen v. Ascension Health*, No. 3:12-CV-501, 2013 WL 6073549, at *3 (M.D. Tenn. Nov. 18, 2013) (dismissing *qui tam* for failing to specify, *inter alia*, "which of those Medicare patients whose claims were false had claims actually submitted to the government for payment").

Relator insists nevertheless that there is "overwhelming indicia of reliability" for his allegations that false claims were submitted to the government payors. (Am. Compl. ¶ 132.) Unlike cases where a relator has personal knowledge that a defendant *submitted* false claims, however, Relator misleadingly claims "firsthand knowledge of Defendants' medical coding *and billing practices*" and responsibility for "reviewing and approving claims *to be submitted* to the government," (*Id.* ¶¶ 125, 129 (emphasis added).) He alleges no personal experience with *bill*

*submission*.[19] Instead, he merely entered billing *codes* into Defendants' computer system to identify treatments rendered, without evidently having anything more to do with preparing or submitting any bills. (*Id.* ¶ 128.)

Relator's supposed "personal knowledge" is limited to what he understands about *someone else's* job. (*See* Am. Compl. ¶ 132(a).) Indeed, he acknowledges that a different Practice employee, Sondra Beausang, "is responsible for the final [bill] processing and submission" and the "actual submission of claims to the patients' government and private insurance providers."[20] (*Id.* ¶¶ 126, 129-30 (emphasis added).) Relator's alleged "review" of claims *to be submitted* does not indicate any knowledge regarding what treatments, if any, were ultimately billed or to whom. Additionally, Relator's alleged "multiple conversations" with Ms. Beausang do not establish Relator's *own* firsthand knowledge about anything. And from those conversations, Relator learned only about the unspecified billings for one patient, Patient N. Ms. Beausang's alleged reports regarding other billings do not identify (i) any specific billings relating to the supposedly "false" billing involving documentation issues (plan approval and QA evaluations), or (ii) any specific bill or patient relating to the alleged claims for inadequately supervised treatments. These general reports provide neither indicia of reliability based on firsthand knowledge, nor specific allegations about false claim submission. *Cf. Atkins*, 470 F.3d at 1359 (declining to relax Rule 9(b)'s requirement that particular claims be pled because relator did "not profess to have firsthand knowledge of the defendants' submission of false claims," as he was "a [practitioner] responsible for the provision of medical care, not a billing and coding

[19] His description of the billing system is based only on "information and belief," not personal knowledge. (Am. Compl. ¶126.)

[20] Again, Relator's allegations make it equally plausible that this billing was to non-government payors, rather than to government payors.

administrator responsible for filing and submitting the defendants' claims for reimbursement"). Relator has not alleged the actual submission of false claims.

**3. The Amended Complaint does not identify specific false certifications.**

Just as the Amended Complaint fails to identify specific false claims, it also fails to identify any specific false certifications of regulatory compliance with the supposed conditions of payment. Relator discusses various categories of alleged false certifications (*see* Am. Compl. ¶¶ 172, 181), but never pleads a specific false certification. He thus never identifies, *inter alia*, "exactly which documents," "exactly which sentence and its substance," "who was responsible," "when the [c]ertification was submitted," "and what the Defendants gained as a result." *Matheny*, 671 F.3d at 1225 (*qui tam* satisfied Rule 9(b) where it alleged those details). This does not pass muster under Rule 9(b). *See, e.g.*, *Schubert*, 2013 WL 1651811, at *4 (dismissing complaint for failing, *inter alia*, to allege false certifications with particularity and contrasting the deficient allegations with *Matheny* allegations' level of detail).

**4. Relator's additional allegations fail for lack of support.**

Relator demands recovery for three additional categories of false claims that must be dismissed under Rules 8(a) and 9(b) because the Amended Complaint again does not provide any factual support for its allegations. First, the Amended Complaint demands recovery for any claims where services provided were not medically necessary. (Am. Compl. ¶¶ 134(k)-(l), 144(k)-(l), 153(k)-(l), 163(k)-(l).) The Amended Complaint references Medicare requirements that services be medically necessary (*id.* ¶¶ 28, 30, 34, 58, 69), but does not identify any services provided and billed for that were not medically necessary. Second, Relator seeks recovery for any claims to reimburse for unsupervised IGRT procedures (*id.* ¶¶ 122, 134(j), 144(j), 153(j), 163(j)), but does not allege that Defendants submitted any claims to the Government for such treatments. The only IGRT procedure specified was coded so as to *not* generate a bill. (*Id.* ¶¶

118-119.) In addition, the only treatments allegedly provided were not IGRT. (*Id.* ¶¶ 55, 104.) Third, Relator alleges that billing documentation was falsified by listing Dr. Bryant "as both the primary oncologist and covering oncologist" regardless of whether she was "actually in the facility in which the radiation treatment delivery procedures occur" (*id.* ¶ 109). Relator does not, however, identify any specific "documentation" at issue, and infers without any explanation or authority that being listed as a "primary" and "covering" physician is synonymous with a representation of "direct supervision." Relator cites no requirement to identify the supervising physician in any claim submission to Medicare.

### D. Counts V and VI Fail to Allege Plausibly or Particularly the Submission of False Statements Material to False Claims.

Counts V and VI assert that Defendants made false statements material to the government's payment of false claims. (*See* Am. Compl. ¶¶ 171-180, 181-188.) To state a claim under § 3729(a)(1)(B), the FCA's "false statement" provision, a complaint must plead adequately that "(1) the defendant made a false record or statement [material to] a false claim paid or approved by the government; and (2) the defendant's false record or statements caused the government to actually pay a false claim, either to the defendant itself, or to a third party." *Mastej*, 2013 WL 1149255, at *11 (citation omitted). To support these Counts, the Amended Complaint references categories of allegedly false certifications and other statements. (*See* Am. Compl. ¶¶ 172(a)-(j), 181(a)-(j).) The "documentation" allegedly falsified is not specified, nor is the materiality of that documentation to any claim payment decision described or explained. Moreover, FCA liability for false statements rests on those statements being made in support of a false claim, and as discussed, Relator has not pled adequately that false claims were submitted to the government. Similarly, he has failed to identify any specific instances of other allegedly

false statements. Relator does not identify any false statements made to Medicare in order to satisfy any condition of payment. Counts V and VI must therefore be dismissed.

### E. Counts VII and VIII Fail to Allege Plausibly or Particularly the Existence of "Reverse" False Claims.

Counts VII and VIII allege, in conclusory fashion, that Defendants engaged in "reverse false claims" by making false statements to conceal a failure to refund improperly received government payments. (*See* Am. Compl. ¶¶ 189-198, 199-208.) To state a claim under FCA's "reverse false claims" provision (§ 3729(a)(1)(G)), a complaint must plead adequately "(1) a false record or statement and (2) the defendant's knowledge of the falsity; (3) that the defendant makes, uses, or causes to be made or used a false statement; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) materiality of the misrepresentation." *Mastej*, 869 F. Supp. 2d at 1346 (citation omitted).

Counts VII and VIII must be dismissed because they impermissibly parrot the elements of the statutory causes of action; "simply mak[ing] legal conclusions that [D]efendants" violated the law, without offering any "specific allegations" to support the claim. *Mastej*, 869 F. Supp. 2d at 1346 (dismissing claim regarding reverse false claims). The Amended Complaint provides no specific factual support regarding alleged withholding of overpayments. In addition to its failure to plead adequately any actual false claims, "[t]he [Amended] Complaint fails to allege any amounts owed to the government by the defendants." *Id.* at 1346. Nor does it identify any "specific false statement or record that was made to knowingly conceal or decrease an obligation to pay or transmit money to the Government," or offer any non-conclusory "factual assertions" to that effect. *U.S. ex rel. Heesch v. Diagnostic Physicians Grp., P.C.*, No. 1:11-CV-364, 2014 WL 2154241, at *10 (S.D. Ala. May 22, 2014) (dismissing government's reverse false claims count under Rule 9(b)).

Moreover, "[t]o sustain a reverse false claim action, relators must show that the defendants owed an obligation to pay money to the United States *at the time of the allegedly false statements*." *Matheny*, 671 F.3d at 1223 (emphasis added). The Amended Complaint does not allege any certifications about concurrently existing obligations to repay funds *already received* but instead references only categories of certifications made to obtain government money *in the future* – *i.e.*, certifications concerning bills being submitted or to be submitted. (*See, e.g.*, Am. Compl. ¶¶ 172(a)-(j), 179(a)-(j).) Because such certifications would concern money not yet received, they were not made "at the time" that Defendants supposedly "owed an obligation to pay money" back to the government *Matheny*, 671 F.3d at 1223. All of these deficiencies under Rules 8(a) and 9(b) compel dismissal of Counts VII and VIII.

## V. CONCLUSION

For the foregoing reasons, Relator's Amended Complaint should be dismissed for failure to plead plausible and particular claims upon which relief may be granted.

Dated: October 7, 2014

Respectfully submitted,

/s/ William D. Horgan
Brian Newman (FBN: 004758)
William D. Horgan (FBN: 176877)
PENNINGTON, P.A.
215 S. Monroe Street, 2nd Floor (32301)
P.O. Box 10095 (32302-2095)
Tallahassee, FL
Telephone: (850) 222-3533
Fax: (850) 222-2126
bnewman@penningtonlaw.com
whorgan@penningtonlaw.com

/s/ Mark D. Colley
Mark D. Colley (*pro hac vice*)
Alan E. Reider (*pro hac vice*)
Murad Hussain (*pro hac vice*)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Fax: (202) 942-5999
Mark.Colley@aporter.com
Alan.Reider@aporter.com
Murad.Hussain@aporter.com

*Counsel for Defendants Space Coast Medical Associates, L.L.P., Dr. Cynthia Jean Bryant, and Brevard Hematology and Oncology Consultants – Levine, Zimm, and Sprawls, M.D., P.A. aka Space Coast Cancer Center*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2014, I served all parties by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system.

/s/ William D. Horgan

Brian Newman (FBN: 004758)
William D. Horgan (FBN: 176877)
PENNINGTON, P.A.
215 S. Monroe Street, 2nd Floor (32301)
P.O. Box 10095 (32302-2095)
Tallahassee, FL
Telephone: (850) 222-3533
Fax: (850) 222-2126
bnewman@penningtonlaw.com
whorgan@penningtonlaw.com
*Counsel for Defendants*