**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA and STATE OF FLORIDA *ex rel.* ROBERT PARKER, *et al.*,**

**Plaintiffs/Relators,**

**Case No.: 6:13-CV-1068-ORL-22TBS**

**v.**

**SPACE COAST MEDICAL ASSOCIATES, L.L.P., *et al.*,**

**Defendants.**
______________________________________/

**DEFENDANTS' CONSOLIDATED**
**MOTION TO DISMISS RELATORS' SECOND AMENDED COMPLAINT**
**AND INCORPORATED MEMORANDUM OF LAW**

Brian Newman (FBN: 004758)
William D. Horgan (FBN: 176877)
PENNINGTON, P.A.
215 S. Monroe Street, 2nd Floor (32301)
P.O. Box 10095 (32302-2095)
Tallahassee, FL
Telephone: (850) 222-3533
Fax: (850) 222-2126
bnewman@penningtonlaw.com
whorgan@penningtonlaw.com

-and-

Mark D. Colley (*pro hac vice*)
Alan E. Reider (*pro hac vice*)
Murad Hussain (*pro hac vice*)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Fax: (202) 942-5999
Mark.Colley@aporter.com
Alan.Reider@aporter.com
Murad.Hussain@aporter.com

***Counsel for Defendants Space Coast Medical Associates, L.L.P., Dr. Cynthia Jean Bryant, and Brevard Hematology and Oncology Consultants – Levine, Zimm, and Sprawls, M.D., P.A. aka Space Coast Cancer Center***

Defendants Space Coast Medical Associates, L.L.P. ("SCMA"), Dr. Cynthia Jean Bryant, and Brevard Hematology and Oncology Consultants – Levine, Zimm, and Sprawls, M.D., P.A. *aka* Space Coast Cancer Center ("Brevard") (collectively, "Defendants" or the "Practice") move to dismiss Relators' Second Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), for failure to plead plausible and particular claims upon which relief may be granted.[1]

**MEMORANDUM OF LAW**

## I. INTRODUCTION

The Second Amended Complaint ("SAC") (Doc. 61) alleges that Defendants submitted false claims for radiation therapy treatments to three government healthcare programs – Medicare Part B, Medicaid, and TRICARE.[2] Despite ample opportunity to review prior Motions to Dismiss (Docs. 43 and 55) and adding a relator, the SAC still lacks the plausibility and particularity necessary to withstand dismissal.[3] The SAC does not allege any factually false claims, and does not articulate any failure to satisfy conditions of payment established by Medicare. Consequently, even accepting all factual allegations as true, the SAC does not set forth a viable cause of action.

---

[1] Like the prior pleading, the SAC adds two Counts solely against Dr. Bryant (*see generally* SAC ¶¶ 161-179 (Counts III and IV)), but continues to assert separate, overlapping counts against all "Defendants" generally, which necessarily includes Dr. Bryant. The legal arguments relating to Defendants also relate to Dr. Bryant, so this Motion will refer to "Defendants" as a whole.

[2] Reimbursement under Medicaid and TRICARE is modeled after Medicare. (*See*, *e.g.*, SAC ¶ 43.)

[3] These are not all of the problems with Relators' allegations. If this case proceeds, then Defendants would show that in April 2013, three months before filing this action, Relator Robert Parker completed an employee survey as part of Space Coast's annual regulatory compliance process in which he represented that he (1) had never observed any conduct by any employee that was improper, illegal, or in violation of the Practice's policies; (2) was not aware of any coding or billing activities that were improper, illegal, or violated any state or federal regulations; and (3) was not aware of any patient care matters that warranted his employer's attention. These signed representations squarely contradict Relators' allegations that Defendants are "responsible for the creation of a serious danger to public health." (SAC ¶ 1.)

Counts I through VIII rest on three alleged billing "schemes" (*see* SAC at 1 (preamble)) that supposedly violated the federal False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G), and the parallel provisions of the Florida False Claims Act.[4] Relators contend that Defendants falsely certified compliance with Medicare requirements (i) for radiation therapy planning activities and (ii) for physician supervision. In fact, Relators do not show that any payment claims violated Medicare requirements, and either misstate or invent those purported requirements.

Relators also fail to plead the alleged fraud with the particularity required by Rule 9(b) (including specific submissions to the government), instead alleging only purportedly improper practices. Disregarding Eleventh Circuit precedent, the SAC does not identify any false claim for payment, false certification, false statement, or government-insured patient whose treatment was billed improperly. This alone is fatal to Relators' case.

## II. THE PARTIES

Defendants operate a multi-facility cancer treatment practice. (SAC ¶ 4.) Brevard is a partner in SCMA (hereinafter together referred to as "Space Coast" or "the Practice"). (*See id.* ¶¶ 2, 4.) Dr. Bryant, a radiation oncologist, is employed by the Practice. (*See id.* ¶ 3.)

Relator Robert Parker was a radiation therapist at Space Coast from June 13, 2011 until he filed this action. (SAC ¶ 6.) Relator Thomas Scheer was a *locum tenens* physician – *i.e.*, a temporary substitute – during July 2013 at Defendants' practice. (*See* SAC ¶ 7.)[5]

---

[4] Relators' claims under the federal and Florida FCAs in Counts I through VI rise or fall together, "[b]ecause the Florida False Claims Act mirrors the federal False Claims Act and is subject to the same pleading standard . . . ." *U.S. ex rel. Schubert v. All Children's Health Sys., Inc.*, No. 8:11-CV-1687, 2013 WL 1651811, at *5 (M.D. Fla. Apr. 16, 2013).

[5] In fact, Relator Scheer served as a *locum tenens* physician at Space Coast for just seven days. He was never employed by and had no other experience with Space Coast.

## III. LEGAL STANDARDS

The FCA prohibits knowingly false or fraudulent claims for federal payments. *See generally* 31 U.S.C. § 3729(a). It "does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *U.S. ex rel. Clausen v. Lab. Corp. of Am. Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002). "Underlying improper practices alone are insufficient to state a claim under the False Claims Act absent allegations that a specific fraudulent claim was in fact submitted to the government." *U.S. ex rel. Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005).

A complaint's factual allegations must rise above speculation. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The liberal Rule 8(a)(2) pleading standard "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009) (interpreting Rule 8(a)(2)). Rather,

> [a] plaintiff must state sufficient facts, assumed true, to state a claim to relief that is plausible on its face, *i.e.*, a claim that creates a reasonable inference of the defendant's liability and fairly notifies the defendant of both the claim and the grounds upon which it rests. A complaint alleging facts merely consistent with a defendant's liability stops short of the line between possibility and plausibility of entitlement to relief and a formulaic recitation of the elements of a cause of action will not do.

*Duldulao v. La Creperia Café, Inc.*, No. 8:11-CV-1413, 2011 WL 6840585, at *2 (M.D. Fla. Dec. 29, 2011) (citations and quotation marks omitted). Under *Iqbal*, courts "first separat[e] out the complaint's conclusory legal allegations and then determin[e] whether the remaining well-pleaded factual allegations, accepted as true, 'plausibly give rise to an entitlement to relief.'" *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 679). "[A] mere legal conclusion (*e.g.*, 'the defendant was negligent') lacks factual content and,

therefore, can offer no factual content in support of the complaint." *Hitchcock v. Scipione*, No. 8:13-CV-2581, 2013 WL 6184037, at *1 (M.D. Fla. Nov. 25, 2013).

Relators' FCA complaint must also comply with Rule 9(b)'s heightened specificity standard, and contain detailed allegations about all "allegedly fraudulent acts, when they occurred, and who engaged in them," and the existence and timing of "actual improper claims" submitted to the government. *Clausen*, 290 F.3d at 1310-12 (citation omitted). Rule 9(b) "protect[s] defendants from frivolous suits, or spurious charges of immoral and fraudulent behavior," so that plaintiffs cannot "learn the complaint's bare essentials through discovery and . . . needlessly harm . . . defendants' goodwill and reputation by bringing a suit that is, at best, missing some of its core underpinnings, and, at worst, are baseless allegations used to extract settlements." *Id.* at 1313 n.24 (citations and quotation marks omitted). Rule 9(b) yields "claims with discernible boundaries and manageable discovery limits." *U.S. ex rel. Feingold v. Palmetto Gov't Benefits Adm'rs*, 477 F. Supp. 2d 1187, 1196 (S.D. Fla. 2007) (citation omitted).

FCA complaints must set forth plausibly and with particularity the "who," "what," "where," "when," and "how" of a "fraudulent submission[] to the government." *Corsello*, 428 F.3d at 1014 (affirming dismissal of *qui tam* for lack of particularity); *cf. Freeman v. Sharpe Resources Corp.*, No. 6:12-CV-1584, 2013 WL 2151723, at *9 (M.D. Fla. May 16, 2013) (Conway, C.J.) (adopting report and recommendation) (Rule 9(b) requires a complaint to allege "(1) the precise statements, documents or misrepresentations made; (2) the time, place and person responsible for the statements; (3) the content and manner in which the statements misled plaintiff; and (4) what the defendants gained from the alleged fraud").

The SAC must be assessed to determine whether it whether it (i) alleges plausibly or particularly a violation of any condition for Medicare payment and (ii) identifies specific false

certifications of compliance with payment conditions. Absent such allegations, Relators have not pleaded any "false" claims.

## IV. ARGUMENT

### A. Counts I Through IV Do Not Plausibly Allege That Any Claim Presented To The Government Was Actually False.

Counts I through IV rest on allegedly false claims for government payment. (*See* SAC ¶¶ 142-179.) FCA liability under the "presentment" provision (§ 3729(a)(1)(A)) requires showing "that the Defendant ma[d]e or cause[d] a claim to be made; that the claim was false; that the falsity was known to the Defendant; and that payment was actually sought from the Government." *U.S. ex rel. Keeler v. Eisai, Inc.*, 568 F. App'x 783, 794 (11th Cir. 2014). Even accepting Relators' factual allegations as true, the SAC does not demonstrate how any alleged claim for Medicare payment was false or fraudulent.

A claim may be "factually" false if it "misrepresents what goods or services [were] provided to the government," or it may be "legally" false "when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment." *U.S. ex rel. Prime v. Post, Buckley, Schuh & Jernigan, Inc.*, No. 6:10-CV-1950, 2013 WL 4506357, at *8 (M.D. Fla. Aug. 23, 2013) (citation omitted).

> Where a contractor participates in a certain government program in order to perform the services for which payments are eventually made – in this case, Medicare – courts are careful to distinguish between conditions of program participation and conditions of payment. Conditions of participation, as well as a provider's certification that it has complied with those conditions, are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program. Conditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment.

*U.S. ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, No. 6:09-CV-10002, 2014 WL 2968251, at *5 (M.D. Fla. July 1, 2014).

The SAC does not allege that Defendants submitted factually false claims, *i.e.*, that the Practice billed for services that were not provided. Therefore, the SAC must instead allege, with particularity, that Defendants' claims were legally false because they falsely certified compliance with a condition of payment. "Proceeding under the false certification theory, however, does not alleviate Relator's obligation to plead [his] case with particularity." *Schubert*, 2013 WL 1651811, at *3. To plead a false claim via false certification here, the SAC must plausibly and particularly allege (1) violations of conditions of payment for radiation therapy, and (2) *specific* false certifications of compliance with such conditions. The SAC does neither.

Relators allege that Defendants undertook three schemes that supposedly violated Medicare's documentation and supervision requirements for radiation therapy by treating patients (1) before a radiation oncologist "verified" the treatment plan (SAC ¶ 79); (2) before a medical physicist performed quality assurance evaluations on the patient (*id.* ¶ 91); and (3) without a radiation oncologist present at the treatment facility (*id.* ¶ 101). None of this violates a condition of payment established by Medicare (or by any other government payor).

**1. The Medicare coverage framework**

At issue here is the Medicare Part B program. (*See* SAC ¶ 24.) "Medicare Part B is a public health insurance program that provides the disabled and elderly with outpatient items and services . . . ." *Hays v. Sebelius*, 589 F.3d 1279, 1280 (D.C. Cir. 2009). Payment under the program is governed by statutory, regulatory, and administrative authority. The Secretary of Health and Human Services ("HHS") administers Medicare Part B through the Centers for Medicare and Medicaid Services ("CMS"). CMS delegates many administrative functions – including reviewing and processing claims – to regional "Medicare Administrative Contractors" ("MACs"). *See id.*; 42 U.S.C. § 1395kk-1(a)(4). HHS can issue a "national coverage determination" ("NCD") to establish "whether or not a particular item or service is covered

nationally" by Medicare Part B. 42 U.S.C. § 1395y(l)(6)(A). Absent an applicable NCD, a MAC may develop a "local coverage determination" ("LCD") to explain whether a particular service is covered within that MAC's geographic area. *See id.* § 1395kk-1(a)(4); *id.* § 1395y(l)(5) & (6)(B); *Hays*, 589 F.3d at 1280. LCDs "clarify the conditions of coverage and reimbursement for particular services." (SAC ¶ 26.)

There are no NCDs addressing coverage for any of the radiation therapies at issue here: Intensity Modulated Radiation Therapy ("IMRT"), Stereotactic Body Radiation Therapy ("SBRT"), Stereotactic Radiosurgery ("SRS"), and Three-Dimensional Conformal Radiation Therapy ("3D-CRT"). (*See* SAC ¶¶ 61, 110 (alleging that these procedures comprise 100 percent of the Practice's radiation treatments).) First Coast Service Options, Inc. ("FCSO"), the MAC for Florida, has published two applicable LCDs cited in the SAC, attached for the Court's convenience,[6] and discussed below: LCD L29200, regarding IMRT (attached hereto as Exhibit A), and LCD L30366, regarding SRS and SBRT (attached hereto as Exhibit B).[7]

**2. The allegations of untimely documentation**

The SAC alleges that "Dr. Bryant routinely fails *to verify* radiation treatment plans *prior to* Defendants' *delivery of radiation treatment* on cancer patients." (SAC ¶ 79 (emphases added).) The related allegations focus on Dr. Bryant's supposed failure to document her "approval" of IMRT treatment plans before patients undergo the procedure. (*See id.* ¶¶ 80-85.)

---

[6] These LCDs are judicially noticeable and available on the official CMS website at http://www.cms.gov/medicare-coverage-database. Additionally, the SAC's extensive quotation of these LCDs incorporates them by reference. *See Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1266 n.11 (11th Cir. 2006) ("[A] document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, we may consider such a document if that document is central to the plaintiff's claims." (citation and quotation marks omitted)).

[7] There is no FCSO LCD for 3D-CRT.

Contrary to Relators' allegation, however, formally verifying and documenting treatment plan approval before treatment begins is not a condition of Medicare payment.

LCD L29200 requires certain "documentation" to support *billing* for IMRT treatments, such as a radiation oncologist's signed and dated review of the treatment plan. (*See* SAC ¶ 82 (quoting LCD); *see also* Ex. A at 2-3.) The LCD does not, however, require physicians to verify their approval of the plans formally in the billing documentation before commencing treatment.

Relators have conflated (1) Dr. Bryant's responsibility to develop and approve the plan before *administering* treatment, and (2) her responsibility to *document* that approval before *billing* for treatment. Relators allege that Dr. Bryant fails to "verify" radiation treatment plans, a term which their allegations equate to "approval" of those plans. (SAC ¶¶ 79-80.) Yet, Relators acknowledge that the delivery of radiation treatment is itself dependent on having a plan *already* "developed" by the radiation oncologist. (*Id.* ¶¶ 83-84.) They attempt to equate "approval" as a matter of billing documentation with "approval" of the treatment plan developed to establish and control the patient's therapy. (*Id.* ¶¶ 86, 88-89.) They do not allege, however, that Defendants ever treated patients without a plan in place "developed" and approved by Dr. Bryant, or that treatment was ever administered (or billed for) without a proper plan (*i.e.*, a therapist like Relator Parker did not on his own simply administer radiation treatments without an appropriately prescribed plan). Rather, Relators allege *only* that the treatment plan's approval might have been verified in the billing documentation some time *after* treatment commenced. But this is not a legal problem. Relators cite no requirement that a treatment plan's approval must be *documented* for billing purposes before treatment begins. This alone ends the inquiry.

Even assuming that treatment plan approval should be verified in billing documentation before treatment commences, the SAC does not allege why Medicare would withhold payment

for an otherwise valid treatment simply because this ministerial requirement was not satisfied. *Cf. Baklid-Kunz*, 2014 WL 2968251, at *5 (rejecting argument that hospital's patient admission claims were rendered false by absence of physician admission orders, where relator "offer[ed] no argument as to why Medicare would refuse to pay an otherwise valid claim if it knew that the patient's medical record did not contain an admission order (or, along the same lines, an argument that the government would be damaged by paying an otherwise valid claim in the absence of such an order)"). The SAC does not establish that this documentation step is a condition of payment. The SAC, therefore, fails to plead this alleged scheme adequately to preserve any related Count for FCA liability. (*See* SAC ¶¶ 143(d)-(f), 153(d)-(f), 162(d)-(f), 172(d)-(f).)[8]

The SAC also alleges that the Practice delivered "serious radiation treatment" before its medical physicist, Dr. Andrew Winningham, performed quality assurance ("QA") evaluations on patients. (SAC ¶ 91.) This allegation, however, is based solely on Dr. Winningham's alleged failure to perform a formal QA evaluation of a *single* patient's SBRT procedure before the patient received treatment. (*See id.* ¶¶ 92-97.) As an initial matter, an account of a single

[8] Relators allege, hypothetically, that *if* Defendants ever sought payment from the government for radiation treatments administered *before* Dr. Bryant approved those treatment plans, such payment claims would be fraudulent "because such plans were not developed or supervised by Dr. Bryant." (*See* SAC ¶ 86.) Relators do not allege that this ever happened. To be clear: the SAC does not allege that Defendants submitted bills for plan development (under CPT Code 77301) before Dr. Bryant documented her approval. To the contrary, Relators specifically reference Dr. Bryant's approval of the plans. (*Id.* ¶¶ 85, 87.) The allegations merely allege that Dr. Bryant's plan approvals and verifications were not recorded in billing documentation before treatments commenced. There is no requirement for such billing documentation of treatment plans before treatments are performed. Nor is there any allegation that Defendants submitted claims for plans that Dr. Bryant did not develop and approve, or for treatments provided other than pursuant to an approved plan.

patient's experience is a facially insufficient factual foundation for the purported fraudulent billing *scheme* that Relators allege.[9]

The SAC does not allege that any statute, regulation, or other controlling authority requires performing formal QA evaluations before each treatment.[10] Nor is there any allegation that pre-treatment QA evaluations are a condition of Medicare payment for an otherwise valid claim. Instead, Relators attempt to extrapolate a requirement for pre-treatment QA evaluations from an LCD provision relating to the *billing documentation* required for these procedures. That LCD requires a signed evaluation of "the technical aspects of the treatment," but does not impose any requirement relating to a per-patient, pre-treatment "quality assurance evaluation." (*Compare* Ex. B (LCD L30366), *with* SAC ¶¶ 91, 94, 96, 97.)

Relators have once again conflated LCD requirements for *billing documentation* with *pre-treatment obligations*. LCD L30366 does not require formal documentation of QA evaluations "prior to *performing*" the procedures, as the SAC alleges (SAC ¶ 96 (emphasis added)); whatever must be documented is required only "prior to *submitting* claim forms" (*id.* ¶ 95 (citing LCD) (emphasis added)). Furthermore, the SAC does not allege any specific occasion when the Practice *submitted bills* for SBRT or SRS before Dr. Winningham performed and documented any QA evaluations required by the applicable LCD. As a result, Relators have also failed to plausibly or particularly plead this alleged scheme sufficiently to preserve any related Count for FCA liability. (*Id.* ¶¶ 143(g)-(i), 153(g)-(i), 162(g)-(i), 172(g)-(i).)

---

[9] Relator Parker claims to know when, during his employment, the alleged failures to complete pre-treatment QAs occurred. Yet, he cites no other instance. (*See* SAC ¶¶ 99-100.)

[10] Relators allege that QA is a prerequisite to conducting SBRT. (SAC ¶ 97.) The SAC's only cited reference to "quality assurance," however, concerns the LCD for the different IMRT procedure. Further, that LCD calls only for documentation confirming that a "quality assurance (QA) program to monitor the IMRT planning and delivery systems" has been established, not for a per-patient pre-treatment QA. (*Id.* ¶ 98.)

### 3. The allegations of insufficient supervision

The SAC alleges that the Practice delivered radiation therapy when a radiation oncologist (*i.e.*, Dr. Bryant) was not present at the treatment facility. (SAC ¶ 101.) Relators repeatedly offer only legal conclusions about the supervision that Medicare requires for radiation therapy, such as: "Many radiation therapy procedures require [Dr. Bryant's] direct supervision" (*id.* ¶ 50), meaning that she must be physically present at the facility and able to furnish assistance during the procedure (*id.* ¶ 108 (quoting 42 C.F.R. § 410.32(b)(3)(ii))). Such legal conclusions need not be accepted as true. *See Iqbal*, 556 U.S. at 678. Indeed, Relators' legal conclusion is wrong.

The applicable LCDs do not require that a radiation oncologist be present during radiation therapy. In fact, LCDs L29200 and L30366 say *nothing* about physician supervision requirements for the radiation treatments at issue.[11] (*See generally* Exs. A & B.) This silence is noteworthy because FCSO knows how to specify supervision requirements when it wants to: the final section of LCD L29200 requires that a radiation oncologist directly supervise a fifth type of procedure, not at issue here, called Image Guided Radiation Therapy ("IGRT").[12] (*See* Ex. A at 5.) FCSO's decision not to establish similar supervision requirements for the other procedures in its LCDs means that direct supervision by a radiation oncologist is not a condition of Medicare

---

[11] Relators wrongly assert that LCD L30366 requires the presence of a radiation oncologist "throughout the provision of SBRT and SRS." (SAC ¶ 116.) The quoted passage of the LCD merely notes the requirements that a radiation oncologist (or a neurosurgeon) evaluate and document his or her evaluation of the clinical and technical aspects of treatment. (*See id.*; *see also* Ex. B at 8.) Nothing in LCD L30366 discusses supervision.

[12] Although the SAC makes many allusions to IGRT, it does not allege that Defendants billed any government program for IGRT procedures where a radiation oncologist was not present. To the contrary, it alleges that Defendants were cautious to identify IGRT procedures with a non-billable code when a radiation oncologist was not on-site. (SAC ¶¶ 125-126.) Although Relators also assert that "SBRT and SRS require the use of IGRT" (*id.* ¶ 120), the LCD applicable to those procedures (LCD L30366) makes no mention of IGRT or any supervision requirements. Nor does the SAC allege that Defendants billed for inadequately supervised IGRT in connection with any SBRT or SRS treatment.

payment. *Cf. Whitfield v. United States*, 543 U.S. 209, 216-217 (2005) (where Congress demonstrated that it knows how to impose a requirement elsewhere, the requirement will not be read into a provision where it was omitted). As a result, the SAC's allegations that Dr. Bryant did not directly supervise certain treatments are of no consequence.

The SAC notes that the Medicare Benefit Policy Manual ("MBPM") "require[s] direct personal supervision of *a physician*" for radiation therapy provided in a physician's office, meaning the physician "must be in the area and immediately available to provide assistance and direction throughout the time the procedure is being performed." (SAC ¶ 106 (emphasis added; quotation marks omitted).) Significantly, the MBPM only requires supervision by "a physician," but does not mandate that the *physician* be a *radiation oncologist*. The SAC does not allege that *no* physician was on site during radiation treatments.[13] To the contrary, Relators acknowledge that other physicians – such as medical oncologists (*i.e.*, physicians specializing in non-radiation cancer treatments) – *were* present in the facility. (*Id.* ¶ 111.)

Relators' reliance on 42 C.F.R. 410.26(b) is also misguided. (*See* SAC ¶107.) This provision applies only to services provided "incident to" the services of a physician or non-physician practitioner. Medicare's "incident to" rules, however, are not applicable to services like radiation therapy, because radiation therapy services are specifically listed in the Social Security Act as a separate Medicare benefit. *See* 42 C.F.R. 410.26(a)(7); *see also* Social Security Act § 1861(s)(4), *codified at* 42 U.S.C. § 1395x(s)(4) (establishing Medicare coverage for X-ray,

[13] Medicare contemplates that radiation treatments may be supervised by a physician other than the treating radiation oncologist: "CMS would not expect that the supervisory physician or nonphysician practitioner would make all decisions unilaterally without informing or consulting the patient's treating physician or nonphysician practitioner." CMS Medicare Benefit Policy Manual, Ch. 6 § 20.5.2 at 19-20, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c06.pdf.

radium, and radioactive isotope therapy, including materials and services of technicians).[14] Accordingly, the MBPM (Ch. 15, §90) establishes the *only* applicable supervision requirements for radiation therapy, which requires only that supervision be by "a physician." (SAC ¶ 107.)

Relators do not cite any authority that disqualifies other physicians – such as medical oncologists – from providing the requisite supervision for radiation treatments (*i.e.*, being available at the facility). Instead, they insist that medical oncologists are not "clinically appropriate" to supervise the procedures because they lack knowledge to "'change a procedure or the course of treatment being provided to a particular patient.'" (*See* SAC ¶¶ 111-114 (quoting CMS, *Medicare Program: Changes to the Hospital Outpatient Prospective Payment System and CY 2010 Payment Rates; Changes to the Ambulatory Surgical Center Payment System and CY 2010 Payment Rates; Final Rule* ("CMS 2009 Hospital Payment Guidance"), 74 Fed. Reg. 60316, 60584 (Nov. 20, 2009)).) Relators' bald allegation that physicians other than radiation oncologists – such as medical oncologists – cannot provide appropriate supervision is entirely unsupported and inconsistent with the source they reference.

Relators cite CMS guidance from 2009 concerning requirements applicable to *hospitals*, not to physician practices such as Space Coast. (SAC ¶ 112 (citing CMS 2009 Hospital Payment Guidance, 74 Fed. Reg. at 60584).) Even if this hospital-related guidance did apply to Space Coast – which it does not – Relators have misinterpreted its meaning. In the following year's version of that guidance, CMS was asked *specifically* whether radiation oncologist supervision was required and did not affirm any such requirement. *See* CMS, *Medicare Program: Hospital*

[14] 42 C.F.R. 410.26(a)(7) and 42 C.F.R. 410.26(b) define "services and supplies" to mean "any services or supplies (including drugs or biologicals that are not usually self-administered) that are included in section 1861(s)(2)(A) of the Act ***and are not specifically listed in the Act as a separate benefit included in the Medicare program***." 42 C.F.R. 410.26(a)(7) (emphasis added). Because radiation therapy has a separate benefit category, it is excluded from the "services and supplies" paid for "incident to" a physician's services.

*Outpatient Prospective Payment System and CY 2011 Payment Rates*, 75 Fed. Reg. 71800, 72012 (Nov. 24, 2010) (emphasis added). Instead, it acknowledged that radiation treatments could be supervised even by "*nonphysician* practitioners." *See id.* (emphasis added). Relators' attempt to impose a more stringent requirement on the Practice is not supported by any governmental authority. Furthermore, it makes no sense. Medicare would not permit non-physician practitioners to supervise these treatments in a hospital, but mandate that in other clinical settings on-site supervision by a *physician* is insufficient unless that physician is a radiation oncologist. Relators' argument rests on an effort to invent, via illogical interpretation, a supervision requirement that does not in fact exist.[15] Because Relators have not alleged that supervision by a radiation oncologist is a Medicare condition of payment for the procedures at issue, they have not presented a basis for the FCA liability asserted in Counts I-IV regarding claims for services allegedly not supervised by a radiation oncologist. (*See* SAC ¶¶ 143(a)-(c), 153(a)-(c), 162(a)-(c), 172(a)-(c).)

**B. Relators' Allegations Do Not Show That Any Claims For Payment Were "Knowingly" False.**

FCA liability depends on the submission of claims that are known to be false. Claims and statements are "knowingly" false when a person has "actual knowledge of the information," or "acts in deliberate ignorance" or "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1).

Relators have not cited any regulatory provisions that articulate the documentation and supervision requirements on which their action depends, such that any non-compliant claim

[15] Relators also allege that physician supervision at Defendants' facilities is not truly supervision because the physicians are "not routinely informed which patients are receiving radiation treatment delivery at any given time." (SAC ¶ 114.) Aside from offering no support for their allegation, Relators cite no requirement for such communication with the supervising physician. Direct supervision requires only that the physician be available at the facility. (*Id.* ¶ 108.)

would be objectively false. Instead, they interpret and extrapolate alleged requirements, which means that they must demonstrate, based on *indirect* evidence, that the regulatory requirements were so clear that acting to the contrary was at least reckless disregard. *See U.S. ex rel. Streck v. Allergan, Inc,* 894 F. Supp. 2d 584, 592 (E.D. Pa. 2012).

Although not an FCA case, in *Safeco Insurance Co. v. Burr*, 551 U.S. 47 (2007), the U.S. Supreme Court resolved that "reckless disregard" is an objective standard. Courts have subsequently applied *Safeco* when interpreting the FCA's knowledge requirement. *See, e.g.*, *Streck*, 894 F. Supp. 2d at 592 (applying *Safeco*); *U.S. ex rel. K & R L.P. v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008) (same). Consequently, the alleged violation of a statutory or regulatory requirement must be more than merely "careless"; an objectively reasonable, plausible interpretation of ambiguous language precludes a finding of actual knowledge, deliberate ignorance, or reckless disregard.

Under *Safeco*, "for Relator[s'] . . . Complaint to survive, the Court must conclude that it plausibly shows that Defendants' interpretation of" the relevant administrative requirements "'ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.'" *Streck*, 894 F. Supp. 2d at 593, 600 (partially dismissing *qui tam* under Rule 12(b)(6)) (quoting *Safeco*, 551 U.S. at 70); *see also U.S. ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1190 (8th Cir. 2010) (affirming dismissal of *qui tam* under Rule 12(b)(6) and explaining that "a statement that a defendant makes based on a reasonable interpretation of a statute cannot support a claim under the FCA if there is no authoritative contrary interpretation of that statute").

Medicare's only articulation of purported supervision requirements mandates radiation oncologist supervision for only one radiation therapy procedure, IGRT, which is not at issue in

this case. For the radiation therapy procedures that *are* at issue here, Medicare expressly allows both physicians (whether or not radiation oncologists) *and* non-physician practitioners to fulfill the supervisory function. Relators' claims improperly rest on their personal view of what constitutes a physician who is "clinically appropriate" to provide the requisite supervision. Relators identify no communication from CMS or FCSO – the entities that establish conditions for Medicare payment – providing any reason for Defendants to have understood that they could not submit claims for radiation treatments unless supervised by a radiation oncologist.

Likewise, Relators do not cite any Medicare requirement for pre-treatment therapy plan approvals or QA. Even if those steps were not accomplished as alleged, Relators have not shown any basis for Defendants to have known that such actions would render false their claims for Medicare payment. Accordingly, the SAC must be dismissed because Relators have not presented allegations which, if true, allow this Court to conclude that the claims were *knowingly* false. *See, e.g., Streck*, 894 F. Supp. 2d at 600 (FCA claim dismissed where "there was no regulatory, statutory, or judicial guidance" to warn defendants "away from the view they took" and the *qui tam* complaint did not allege facts "for the Court to plausibly infer that [the defendants' practices] were not a reasonable interpretation" of regulatory requirements (quotation marks omitted)).

### C. Counts I Through IV Fail To Allege With Sufficient Particularity That False Claims Were Presented To The Government.

Counts I through IV also fail because they do not (1) identify any specific false claims submitted for government payment; (2) plausibly establish that false claims were actually presented to the government; or (3) identify any specific false certifications.

**1. Relators fail to allege specific false claims.**

"The submission of a false claim is the *sine qua non* of a False Claims Act violation." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (citation, quotation marks, brackets, and ellipsis omitted). "Without the presentment of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act." *Clausen*, 290 F.3d at 1311.

"In order to plead the submission of a false claim with particularity, a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *U.S. ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012). "But nowhere in the blur of facts" assembled by Relators "can one find any allegation, stated with particularity, of a false claim actually being submitted to the Government." *Clausen*, 290 F.3d at 1312. Absent specifically alleged "actual false claims," Relators cannot "lay a complete foundation for the rest of [their] allegations." *Id.* at 1314 n.25. The SAC thus fails under Rule 9(b) and, for this reason alone, must be dismissed. *See, e.g.*, *U.S. ex rel. Westlund v. Lab. Corp. of Am. Holdings*, No. 8:10-CV-2882, 2011 WL 6846748, at *1 (M.D. Fla. Dec. 29, 2011) (dismissing *qui tam* complaint that "never identifie[d] a false claim submitted to the government – an element of specificity under Rule 9(b) that [*Clausen*] requires").

**2. Relators fail to allege plausibly that any false claims were actually presented to government programs.**

FCA liability also requires *plausibly* pleading that false claims were "actually being submitted to the Government." *Clausen*, 290 F.3d at 1312. The SAC lacks well-pleaded allegations of such submissions.

Relators' only attempt to identify specific false claims is a failure. They allege that from March 2013 to June 2013, the Practice provided radiation therapy to 11 patients while supposedly violating documentation and supervision requirements; that at some unspecified later time, those services "were billed" to either Medicare or another payor; and that the bills were "false" because of the violations. (*See* SAC ¶¶ 117-118, 125, 129-130.) Only three of the eleven patients are characterized as "Medicare patient[s]." (*Id.* ¶¶ 92 (patient N), 118 (patient P), 125 (patient R).)[16] Merely because someone is a Medicare patient, however, does not mean that Medicare was billed for the treatment. *See, e.g.*, *U.S. ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 460 (4th Cir. 2013) (dismissing *qui tam* action for failing to plead false claims and rejecting relator's assertion that "if a patient is insured under a government program, [courts] reasonably may infer . . . that a claim was presented to the government" for their treatment), *cert. denied*, 134 S. Ct. 1759 (2014). Patients can pay out of pocket or use private insurance. *See, e.g.*, *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 874-876 (11th Cir. 2003). Relator Parker alleges having learned that a bill was submitted to Medicare for one patient, "Patient N," but does not specify what services were billed. (*See* SAC ¶ 141(c).)[17] Relators do not allege that any other bill was submitted to Medicare for these patients.

Relators' other allegations make it merely possible, rather than plausible, that false claims were submitted to government payors. These allegations are equally consistent with the

[16] Eight of the 11 patients are not alleged to be beneficiaries of any government healthcare plan, so they are irrelevant for purposes of Relators' legal claims. (*See* SAC ¶¶ 117 (patient O), 118 (patient Q), 129 (patients S, T, U, and V), 130 (patients W and X).)

[17] Relators allege that Patient N supposedly received unsupervised radiation therapy before a medical physicist performed a QA evaluation (SAC ¶¶ 92, 117), but nothing in the SAC indicates that the bill allegedly submitted for this patient was for that particular treatment. And, even if a bill were submitted to Medicare for that particular treatment, it would not be rendered "false" by allegations that QA evaluations were not documented prior to *treatment* or that a radiation oncologist did not directly supervise the therapy. *See supra* §§ IV.A.2 and A.3.

possibility that treatments were billed to *private* payors, whether insurance companies or the patients themselves, or were not billed at all.[18] *See, e.g.*, *Nathan*, 707 F.3d at 460 (declining to infer that government was billed for certain prescriptions, because allegations were also consistent with the notion that "the patients paid for it themselves or . . . the patients' private insurers paid for it" (citation omitted)); *Clausen*, 290 F.3d at 1311 (rejecting unsupported assertion "that claims requesting *illegal* payments must have been submitted, were likely submitted or should have been submitted to the Government" (emphasis added)). Such ambiguous pleading does not satisfy Rule 8(a), which "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. Because the alleged conduct "*could* have led, but *need not necessarily* have led, to the submission of false claims," Relators must still "allege with particularity that specific false claims actually were presented to the government for payment." *Nathan*, 707 F.3d at 457; *see, e.g.*, *U.S. ex rel. McMullen v. Ascension Health*, No. 3:12-CV-501, 2013 WL 6073549, at *3 (M.D. Tenn. Nov. 18, 2013) (dismissing *qui tam* for failing to specify, *inter alia*, "which of those Medicare patients whose claims were false had claims actually submitted to the government for payment").

Relators nevertheless assert that their allegations contain "overwhelming indicia of reliability" that false claims were actually submitted to government payors. (SAC ¶ 150.) But where, as here, "the allegation is that a defendant's Medicare claim contained a false statement because the claim sought reimbursement for particular medical services . . . . not covered by Medicare," "representative claims with particularized medical and billing content matter more, because the falsity of the claim depends largely on the details contained within the claim

---

[18] Relators concede that in many instances services were identified with a "000000" procedure code, but that a different code ("77421") was required for billing. (*See* SAC ¶¶ 122-126.)

form . . . ." *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, No. 13-11859, 2014 WL 5471925, at *13 (11th Cir. Oct. 30, 2014) (distinguishing these FCA cases from referral-kickback scheme at issue). Here, Relators allege false claims generally because some services, in particular circumstances, supposedly did not comply with certain alleged requirements (*e.g.* sufficient supervision). But they do not identify any actual claims that Defendants submitted for services rendered under those particular circumstances.

Moreover, Relators' allegations confirm that they have no personal knowledge that Defendants *submitted* false claims. Relators misleadingly assert "firsthand knowledge" of Defendants' medical coding *and billing practices*, and Relator Parker claims that he had responsibility for "reviewing and approving claims *to be submitted* to the government." (*Id.* ¶¶ 131, 134, 138 (emphasis added).) Neither Relator alleges, however, any personal experience with *bill submission*.[19] Relator Scheer merely alleges that during the seven days he served as a *locum tenens* physician, he "reviewed Dr. Bryant's patients' charts and schedules" and that from this review deduced that Defendants were billing inappropriately. (*Id.* ¶¶ 55-57, 131-133.) Simply reviewing patient charts, without more, obviously would not indicate what treatments, if any, were ultimately billed and to whom the bill was sent. Relator Scheer does not – and cannot – identify a single patient for whom a single claim was submitted to a government payor. Nor does he offer any reason (plausible or otherwise) to infer that his limited review of *patient charts* would have given him any firsthand knowledge about Defendants' *billing practices*.[20]

---

[19] Relator Parker's description of the billing system is based only on "information and belief," not personal knowledge. (SAC ¶ 135.)

[20] It is likewise implausible to infer from the SAC that during Relator Scheer's brief tenure at Space Coast in July 2013, he acquired a comprehensive understanding of the practice's government billings from June 2011 through August 2013, while also attending to patients. His vague and conclusory allegations about reviewing unspecified "patients' charts and schedules"

Footnote continued on next page

Similarly, rather than describe knowledge of false claim submissions, Relator Parker alleges that he entered treatment *codes* into Defendants' computer system to identify treatments rendered, without evidently having anything more to do with preparing or submitting the bills. (*Id.* ¶¶ 136- 137.) Relator Parker's supposed "personal knowledge" is limited to what he understands about *someone else's* job. (*See id.* ¶ 141(a).) He acknowledges that a different Practice employee, Sondra Beausang, "is responsible for the final [bill] processing and submission" and the "actual submission of claims to the patients' government and private insurance providers."[21] (*Id.* ¶¶ 135, 138-139 (emphasis added).) Relator Parker's alleged "multiple conversations" with Ms. Beausang do not establish his *own* firsthand knowledge about anything. Moreover, he only alleges that he learned from those conversations about *unspecified* billings for one patient, Patient N. Ms. Beausang's alleged reports regarding other billings do not identify (i) any specific billings relating to the supposedly "false" clams involving documentation issues (plan approval and QA evaluations), or (ii) any specific bill or patient relating to the alleged claims for inadequately supervised treatments.

Put simply, neither Relator Parker's alleged "review" of claims *not yet submitted*, nor Relator Scheer's "review" of patients' charts and schedules, indicates any knowledge regarding what treatments, if any, were ultimately *billed*, or *which payors* were billed (if at all). Relator Parker's allegations regarding general reports and Relator Scheer's allegations regarding a general review of patients' charts and schedules, without more, provide neither indicia of reliability based on firsthand knowledge of billing, nor specific allegations about false claim

Footnote continued from previous page
does not warrant the inference that he reviewed *26 months'* worth of charts, schedules, and physician calendars, let alone 26 months' of billing information.

[21] Again, Relators' allegations make it equally plausible that this billing was to non-government payors, rather than to government payors.

submission. *See Atkins*, 470 F.3d at 1359 (declining to relax Rule 9(b)'s requirement that particular claims be pleaded because relator did "not profess to have firsthand knowledge of the defendants' submission of false claims," as he was "a [practitioner] responsible for the provision of medical care, not a billing and coding administrator responsible for filing and submitting the defendants' claims for reimbursement").[22]

**3. The Second Amended Complaint does not identify specific false certifications.**

The SAC fails to identify any specific false certifications of regulatory compliance with supposed conditions of payment. Relators discuss various categories of alleged false certifications (*see* SAC ¶¶ 163, 190), but never plead a specific false certification. They thus never identify, *inter alia*, "exactly which documents," "exactly which sentence and its substance," "who was responsible," "when the [c]ertification was submitted," "and what the Defendants gained as a result." *Matheny*, 671 F.3d at 1225 (*qui tam* satisfied Rule 9(b) where it alleged those details). This does not pass muster under Rule 9(b). *See, e.g.*, *Schubert*, 2013 WL 1651811, at *4 (dismissing complaint for failing, *inter alia*, to allege false certifications with particularity and contrasting the deficient allegations with *Matheny* allegations' level of detail).

**4. Relators' additional allegations fail for lack of support.**

Relators demand recovery for three additional categories of false claims that must be dismissed under Rules 8(a) and 9(b) because the SAC's allegations again do not provide any factual support. First, the SAC demands recovery for any claims where services provided were

[22] *Cf. Mastej*, 2014 WL 5471925, at *9 (distinguishing corporate officer's insider knowledge from "a plaintiff-relator without first-hand knowledge of the defendants' billing practices," as the latter "is unlikely to have a sufficient basis for [asserting that the defendants actually submitted false claims]"); *U.S. ex rel. Walker v. R&F Properties of Lake County, Inc.*, 433 F.3d 1349, 1359 (11th Cir. 2005) (relator satisfied Rule 9(b) by alleging detailed conversations with medical practice's office manager, who said practice "never" billed certain specified services correctly).

not medically necessary. (SAC ¶¶ 143(k)-(l), 153(k)-(l), 162(k)-(l), 172(k)-(l).) The SAC references Medicare's requirement that services be medically necessary (*id.* ¶¶ 31, 33, 37, 64, 75), but does not identify any services provided and billed for that were not medically necessary.

Second, Relators seek recovery for any claims to reimburse for unsupervised IGRT procedures (*id.* ¶¶ 128, 143(j), 153(j), 162(j), 172(j)), but do not allege that Defendants submitted any claims for such treatments. The only IGRT procedure specified was coded so as to *not* generate a bill. (*Id.* ¶¶ 124-125.) In addition, the only treatments allegedly provided were not IGRT. (*Id.* ¶¶ 61, 110.)

Third, Relators allege that billing documentation was falsified by listing Dr. Bryant "as both the primary oncologist and covering oncologist" regardless of whether she was "actually in the facility in which the radiation treatment delivery procedures occur" (*id.* ¶ 115). Relators do not, however, identify any specific "documentation" at issue, and infer without any explanation or authority that being listed as a "primary" and "covering" physician is synonymous with a representation of "direct supervision." Relators cite no requirement to identify the supervising physician in any claim submission to Medicare.

### D. Counts V And VI Fail To Allege Plausibly Or Particularly The Submission Of False Statements Material To False Claims.

Counts V and VI assert that Defendants made false statements material to the government's payment of false claims. (*See* SAC ¶¶ 181-188, 190-197.) FCA liability for a "false statement" (§ 3729(a)(1)(B)) requires a knowingly false record or statement material to a false claim, that "caused the government to actually pay a false claim, either to the defendant itself, or to a third party." *U.S. ex rel. Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1327 (11th Cir. 2009); *see also* 31 U.S.C. § 3729(a)(1)(B). The SAC references categories of allegedly false certifications and other statements (*see* SAC ¶¶ 181(a)-(j), 190(a)-(j)), but the "documentation"

allegedly falsified is not specified, nor is that documentation shown to be material to any claim payment. Moreover, FCA liability for false statements rests on those statements being made to support a false claim, and as discussed, Relators have not pleaded adequately that false claims were submitted to the government. Similarly, they have failed to identify any specific instances of other allegedly false statements. Because Relators do not identify any false statements made to Medicare in order to satisfy any condition of payment, Counts V and VI must be dismissed.

### E. Counts VII And VIII Fail To Allege Plausibly Or Particularly The Existence Of "Reverse" False Claims.

Counts VII and VIII allege, in conclusory fashion, that Defendants engaged in "reverse false claims" by making false statements to conceal a failure to refund improperly received government payments. (*See* SAC ¶¶ 198-207, 208-217.) A "reverse false claim" requires that a defendant knowingly made or used a false statement "material to an obligation to pay or transmit money or property to the Government," or knowingly concealed or knowingly improperly avoided such an obligation. 31 U.S.C. § 3729(a)(1)(G).

Counts VII and VIII merely parrot the elements of the statutory cause of action, and "fail[] to allege, with particularity, the existence of a current legal obligation owed by Defendants, whether in the form of a judgment, fine, levy or contractual obligation." *U.S. ex rel. Romanofsky v. Aggarwal*, No. 6:03-CV-117, 2005 WL 6011259, at *7 (M.D. Fla. Feb. 10, 2005) (dismissing allegations of reverse false claims). The SAC provides no factual support regarding alleged withholding of overpayments. Nor does it identify any "specific false statement or record that was made to knowingly conceal or decrease an obligation to pay or transmit money to the Government," or offer any non-conclusory "factual assertions" to that effect. *U.S. ex rel. Heesch v. Diagnostic Physicians Grp., P.C.*, No. 1:11-CV-364, 2014 WL 2154241, at *10 (S.D. Ala. May 22, 2014) (dismissing government's reverse false claims count under Rule 9(b)).

"[T]o sustain a reverse false claim action, relators must show that the defendants owed an obligation to pay money to the United States *at the time of the allegedly false statements.*" *Matheny*, 671 F.3d at 1223 (emphasis added). "[T]he fact that [Relators] allege[] violations of the FCA is not sufficient to create an obligation, because no such obligation existed at the time any such allegedly false claims were submitted to the government." *Aggarwal*, 2005 WL 6011259, at *7. The SAC does not allege certifications about obligations to repay funds *already received*, but instead references only certifications made to obtain money *in the future* – *i.e.*, concerning bills being submitted or to be submitted. (*See, e.g.*, SAC ¶¶ 181(a)-(j), 190(a)-(j).) Certifications concerning money not yet received were not made "at the time" that Defendants supposedly "owed an obligation to pay money" back to the government. *Matheny*, 671 F.3d at 1223. These Rules 8(a) and 9(b) deficiencies compel dismissal of Counts VII and VIII.

## V. CONCLUSION

For the foregoing reasons, Relators' Second Amended Complaint should be dismissed for failure to plead plausible and particular claims upon which relief may be granted.

Dated: November 13, 2014

Respectfully submitted,

/s/ William D. Horgan
Brian Newman (FBN: 004758)
William D. Horgan (FBN: 176877)
PENNINGTON, P.A.
215 S. Monroe Street, 2nd Floor (32301)
P.O. Box 10095 (32302-2095)
Tallahassee, FL
Telephone: (850) 222-3533
Fax: (850) 222-2126
bnewman@penningtonlaw.com
whorgan@penningtonlaw.com

/s/ Mark D. Colley
Mark D. Colley (*pro hac vice*)
Alan E. Reider (*pro hac vice*)
Murad Hussain (*pro hac vice*)
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Telephone: (202) 942-5000
Fax: (202) 942-5999
Mark.Colley@aporter.com
Alan.Reider@aporter.com
Murad.Hussain@aporter.com

*Counsel for Defendants Space Coast Medical Associates, L.L.P., Dr. Cynthia Jean Bryant, and Brevard Hematology and Oncology Consultants – Levine, Zimm, and Sprawls, M.D., P.A. aka Space Coast Cancer Center*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 13, 2014, I served all parties by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system.

/s/ William D. Horgan

Brian Newman (FBN: 004758)
William D. Horgan (FBN: 176877)
PENNINGTON, P.A.
215 S. Monroe Street, 2nd Floor (32301)
P.O. Box 10095 (32302-2095)
Tallahassee, FL
Telephone: (850) 222-3533
Fax: (850) 222-2126
bnewman@penningtonlaw.com
whorgan@penningtonlaw.com
*Counsel for Defendants*